**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| AIRFLOW CATALYST SYSTEMS, INC., and NETT TECHNOLOGIES INC., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NGK INSULATORS LTD.; NGK AUTOMOTIVE CERAMICS USA, INC.; CORNING INTERNATIONAL KABUSHIKI KAISHA; CORNING INCORPORATED; DENSO CORPORATION, and DENSO INTERNATIONAL AMERICA, INC. <br><br> Defendants. | Civil Action No. 17-cv-13785 |

### CLASS ACTION COMPLAINT

Plaintiffs Airflow Catalyst Systems, Inc. and Nett Technologies Inc. ("Plaintiffs"), individually and on behalf of the proposed class of direct purchasers of Ceramic Substrates, a component of an automotive part, bring this action against Defendants NGK Insulators Ltd., NGK Automotive Ceramics USA, Inc., Corning International Kabushiki Kaisha, Corning Incorporated, DENSO Corporation, and DENSO International America, Inc. (collectively, "Defendants"), and other unnamed co-conspirators, for damages under the antitrust laws of the United States, and demand a jury trial. Based on personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, Plaintiffs hereby allege as follows:

## INTRODUCTION

1.      Defendants—manufacturers and sellers of Ceramic Substrates—engaged in a global conspiracy to fix, maintain and/or stabilize prices, rig bids, and/or allocate the market and customers for Ceramic Substrates in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.

2.      Ceramic Substrates were sold by Defendants and their co-conspirators throughout the United States or installed in motor vehicles that were manufactured or sold throughout the United States.

3.      "Ceramic Substrates" refers to uncoated ceramic monoliths with a fine honeycomb structure that—after being coated with a mix of metal and chemicals— are used in automotive catalytic converters as emission control devices in exhaust-gas purification systems. Catalytic converters purify exhaust gas by converting pollutants in the exhaust-gas stream into less harmful gases through catalytic chemical reactions.

4.      Defendants' long-running conspiracy began at least as early July 1, 1999 and existed through May 16, 2016 ("the Class Period").

5.      Defendants' cartel effectively fixed, maintained, or stabilized prices of Ceramic Substrates by rigging bids, price quotations, and price adjustments submitted to automobile manufacturers in the United States and elsewhere.

6.      It is not surprising, then, that certain characteristics of the Ceramic Substrates market rendered it particularly susceptible to anticompetitive conduct. For example, Ceramic Substrates are interchangeable. They are easily substitutable between Defendants, forcing (in a competitive economy) competition on the basis of price alone. Here, rather than competing on the basis of price, the interchangeability of Ceramic Substrates enabled Defendants to agree on prices

for the product and to monitor those prices. Moreover, high barriers to entry discouraged potential competitors from entering the market and facilitated the collusion that existed in the Ceramic Substrates market. Such characteristics made the Ceramic Substrates market ripe for conspiratorial conduct.

7.     Indeed, Defendants NGK and Corning have pleaded guilty to their involvement in the Ceramics Substrate conspiracy and paid criminal fines in the amount of $65.3 million and $66.5 million, respectively. And, at least one defendant—DENSO—is a repeat offender; that is, DENSO has previously been found guilty of violating antitrust laws for price-fixing conspiracies in the automotive parts market.

8.     As a direct and foreseeable result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and members of the Class paid artificially inflated prices for Ceramic Substrates.

9.     Defendants also fraudulently concealed their illegal conspiracy from the public and their customers, including Plaintiffs and the Class, effectively keeping their conspiracy secret. It was not until September 3, 2015, when the DOJ revealed its investigation into the Ceramic Substrates industry, that Defendants' conspiracy became public.

10.     Plaintiffs seek to represent a class of direct purchasers consisting of all persons and entities who, during the Class Period, purchased Ceramic Substrates in the United States from one or more of the Defendants or their subsidiaries or affiliates.

**JURISDICTION AND VENUE**

11.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 to obtain injunctive relief and to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, against all Defendants.

3

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

13.      The Court has personal jurisdiction over each of the Defendants, either directly or through their ownership or control of their United States subsidiaries, because each Defendant: (a) resides in this District; (b) transacted business throughout the United States, including in this District; (c) sold or marketed substantial quantities of Ceramic Substrates throughout the United States, including in this District; (d) committed overt acts in furtherance of the conspiracy alleged herein in the United States, including this District; (e) engaged in a conspiracy directed at, and that had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities throughout the United States, including this District; or (f) had substantial aggregate contacts with the United States as a whole, including in this District.

14.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c) and (d), because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

15.     Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## TRADE AND COMMERCE

16.     The business activities of Defendants and their co-conspirators, as described in this Complaint, substantially affected interstate trade and commerce in the United States.

17.     During the Class Period, Defendants and their co-conspirators sold Ceramic Substrates in a continuous and uninterrupted flow of interstate commerce, including through and

into this District.

18.     During the Class Period, Defendants and their co-conspirators collectively controlled the market for Ceramic Substrates, both globally and in the United States.

## THE PARTIES

### Plaintiffs

19.     Plaintiff Airflow Catalyst Systems, Inc. is a Delaware corporation with its principal place of business in Rochester, New York.  Airflow Catalyst Systems, Inc. purchased Ceramic Substrates directly from one or more of the Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

20.     Plaintiff Nett Technologies Inc. is a corporation formed under the laws of the province of Ontario, Canada, with its principal place of business in Mississauga, Ontario, Canada. Nett Technologies Inc. purchased Ceramic Substrates directly from one or more of the Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

### Defendants

**The NGK Defendants**

21.     Defendant NGK Insulators, Ltd., is a Japanese corporation with its principal office in Nagoya, Japan. During the Class Period, NGK Insulators, Ltd.—directly or through its wholly owned or controlled subsidiaries—manufactured, marketed or sold Ceramic Substrates that were purchased throughout the United States, including in this District, during the Class Period.

22.     Defendant NGK Automotive Ceramics USA, Inc., is a Delaware corporation with its principal place of business in Novi, Michigan.  It is a subsidiary of, and is wholly owned or controlled by, its parent, Defendant NGK Insulators, Ltd. NGK Automotive Ceramics USA, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—

manufactured, marketed or sold Ceramic Substrates that were purchased throughout the United States, including in this District, during the Class Period. Its activities in the United States during the Class Period were under the control and direction of NGK Insulators, Ltd.

23. Defendants NGK Insulators, Ltd., and NGK Automotive Ceramics USA, Inc. are collectively referred to as the "NGK Defendants" or "NGK."

**The Corning Defendants**

24. Defendant Corning Incorporated is a New York corporation with its principal place of business in Corning, New York. Corning Incorporated—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, or sold Ceramic Substrates that were purchased throughout the United States, including in this District, during the Class Period.

25. Defendant Corning Int'l K.K. is a Japanese corporation with its principal place of business in Tokyo, Japan. It is a subsidiary of, and wholly owned and/or controlled by, its parent, Corning Incorporated. Corning Int'l K.K.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Ceramic Substrates that were purchased throughout the United States, including in this District, during the Class Period.

26. Defendants Corning Incorporated and Corning Int'l K.K. are referred to collectively herein as "Corning Defendants" or "Corning."

**The DENSO Defendants**

27. Defendant DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Japan. Defendant DENSO Corporation—directly and/or through its subsidiaries and other entities of which it is the ultimate parent, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Ceramic Substrates that were purchased

throughout the United States, including in this District, during the Class Period.

28.     Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. DENSO International America, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Ceramic Substrates that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales and finances.

29.     Defendants DENSO Corporation and DENSO International America, Inc. are referred to collectively herein as "DENSO."

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

30.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not as Defendants in this Complaint.

31.     The acts alleged herein to have been performed by Defendants and their co-conspirators were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of Defendants' (or co-conspirators') business affairs.

32.     Each Defendant and co-conspirator acted as the agent, principal, or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

33.     Whenever this Complaint references an act, deed or transaction of any corporation, the allegation is that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

34.     The acts alleged herein that have been performed by NGK Automotive Ceramics USA, Inc., Corning Int'l K.K., and DENSO International America, Inc. were authorized, ordered, and condoned by their respective parent companies.

## FACTUAL ALLEGATIONS

### A.     Description of Ceramic Substrates

35.     Ceramic Substrates, sometimes referred to as "monoliths," are used in automotive catalytic converters as emission control devices in exhaust gas purification systems. Catalytic converters are used to reduce the amounts of nitrogen oxides, carbon monoxide, and unreacted hydrocarbons in automotive emissions. In dual-bed converter systems, the exhaust gases are first reduced in order to eliminate the oxides of nitrogen. Then they are oxidized with added air in order to eliminate carbon monoxide and unburned hydrocarbons. A typical internal combustion engine automobile has one or two catalytic converters, and the substrate is the surface to which the catalyst in a catalytic converter is affixed.

36.     The diagram below depicts how the catalytic converter works:



37.     For efficiency of conversion, Ceramic Substrates require large surface areas. This is accomplished through the honeycomb monolith structure. These honeycomb monoliths have 1,000 to 2,000 longitudinal pores approximately one millimeter in size and separated by thin walls.

38.     An example of a honeycomb structure Ceramic Substrate is depicted below:



9

**B.      The Ceramic Substrate Customer Procurement Process**

39.      Original Equipment Manufacturers ("OEMs") install Ceramic Substrates in new vehicles as part of their manufacturing process. OEMs, such as automotive manufacturers (e.g. Ford Motor Company, Toyota Corporation, and General Motors) purchase Ceramic Substrates directly from Defendants.

40.      When purchasing Ceramic Substrates for use in new motor vehicles, OEMs issue Requests for Quotations ("RFQs") to part manufacturers, like Defendants. In order to be considered for an award, part suppliers submit price quotations, or bids, to OEMs in response to RFQs.

41.      The RFQ process is designed to obtain competitive, independent bids from multiple suppliers. To that end, an OEM will issue the RFQ to multiple competing parts suppliers, those suppliers will submit bids, and the OEM will select a winner (usually the lowest bid). Sometimes, before selecting the winner, an OEM may revise the technical specifications, and revised bids will be submitted.

42.      RFQs generally include specifications and other relevant information for each motor vehicle product, and are issued to automotive parts suppliers on a model-by-model basis for model-specific parts. RFQs for Ceramic Substrates are issued approximately three years prior to production of a motor vehicle, and Ceramic Substrates themselves are developed over a year in advance of a new model vehicle entering the market.

43.      The parts purchased by the OEM in connection with the RFQ are purchased from the winning parts manufacturers for the lifespan of the motor vehicle model, which on average is four to six years. During that time frame, whenever an OEM purchases Ceramic Substrates for the motor vehicle, it does so from the parts manufacturer who won the RFQ and was awarded the supply contract, at

the price set by that supply contract.

44.     The prices set by the RFQ process are also used when direct purchasers, other than the OEM who issued the RFQ, purchase Ceramic Substrates from Defendants, such as those purchasing Ceramic Substrates to replace parts as they become worn or damaged. Every subsequent purchaser who buys Ceramic Substrates from Defendants pays at least the winning price set by the RFQ or higher.

45.     Thus, the RFQ process described above not only sets the prices for Ceramic Substrates incorporated into new motor vehicles manufactured by that particular OEM, it also sets the price floor for all other direct purchasers, including those making purchases for use as replacement and aftermarket parts.

46.     Defendants manufactured Ceramic Substrates (a) in the United States for finishing and installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and finishing and installation in vehicles manufactured and sold in the United States, and (c) in Japan for finishing and installation in vehicles manufactured in Japan for export to and sale in the United States.

47.     Plaintiffs and members of the Class purchased Ceramic Substrates directly from one or more Defendants and their co-conspirators during the Class Period.

**C.     Specific Characteristics of the Ceramic Substrates Market Made It Ripe for Collusion**

48.     The Ceramic Substrate market possessed many characteristics that made it conducive to a price-fixing agreement during the Class Period. These characteristics are discussed below.

**1.     Interchangeable, Commodity-Like Products**

49.     Commodities are interchangeable with other commodities of the same type. Though the quality of a given commodity may differ slightly, it is essentially uniform across producers. There is little differentiating a commodity from one producer versus another. In an

economy where purchasers view products as easily substitutable, price is typically a driver of competition between market participants. Where products are not distinguished based on attributes of a particular product, competitors are able to agree on and monitor prices for the product.

50.     Defendants complied with industry specifications for Ceramic Substrates on a model-by-model basis. The Ceramic Substrates used in these models were mass produced based on industry specifications, rendering them interchangeable.

51.     Thus, Defendants' Ceramic Substrates were interchangeable, commodity-like products. In a healthy economy, manufacturers of Ceramic Substrates would compete largely on the basis of price. Here, the interchangeability of the products enabled Defendants to fix prices for Ceramic Substrates.

### 2.     Highly Concentrated Industry

52.     The Ceramic Substrates industry is heavily concentrated. Defendants are believed to share over 90% of the U.S. market for Ceramic Substrates. Significant barriers to entry facilitate this high concentration, which in turn enabled the collusion that is the subject of this complaint.

### 3.     High Barriers to Entry

53.     There are significant barriers to entry that preclude potential competitors from entering the Ceramic Substrate market.

54.     Start-up costs are prohibitive. New entrants to the Ceramic Substrates industry are faced with high start-up costs—likely exceeding hundreds of millions of dollars. Incumbents had to invest in manufacturing plants, equipment, energy, transportation, distribution infrastructure, and skilled labor. And, new entrants faced competition with suppliers who had forged longstanding relationships with market participants.

55.     Patent ownership poses another barrier to new market entrants. Defendants and their co-conspirators own patents related to the manufacture of Ceramic Substrates. New entrants must avoid infringing on Defendants' patents when entering the market with a new product. Defendants' patent ownership effectively built an impenetrable wall around their technology, forcing new entrants to use more expensive technology to work around the patents, increasing the price of their products and decreasing competitiveness.

56.     In addition, new entrants face the difficult challenge of manufacturing a product that comports with the unique design of a particular vehicle type. After a Ceramic Substrates supplier is selected, OEMs cannot easily change suppliers because OEMs design their vehicles to integrate particular Ceramic Substrates with other components that are specific to the particular vehicle model, such as engine compartments and fuel tank modules. Thus, manufacturers of Ceramic Substrates and OEMs must agree on a design that is unique to a particular vehicle model.

57.     Defendants also have incentives not to compete with each other in order to maintain minimum viable scale. Minimum viable scale is the smallest average annual level of sales that the committed entrant must persistently achieve for profitability. Because minimum viable scale in the Ceramic Substrates industry is substantial, loss of a position as supplier of choice could have severe consequences for Defendants and their co-conspirators. In order to maintain their position in the market, Defendants and their co-conspirators cooperated with each other in rigging bids in order to not "steal" each other's business.

58.     High barriers to entry in a market facilitate unlawful agreements and cartel practices by making it easier for cartel members to police each other's conduct, thus encouraging fidelity to the unlawful agreements reached. That precisely describes Defendants' conduct here.

### 4.      Inelastic Demand

59.      Price elasticity measures the relationship between a change in the quantity demanded for a particular good and a change in its price. In other words, price elasticity is the measurement of how price sensitive a good is to changes in demand. Demand for a product is inelastic if an increase in price results in only a small decline in quantity sold.

60.      Inelasticity facilitates collusive markets. In an inelastic market, customers facing price increases cannot purchase cheaper alternatives, and will continue to purchase the product despite the price increase. This allows producers to raise their prices without triggering customer substitution and lost sales revenue.

61.      The Ceramic Substrates market bears the economic characteristic of inelastic demand. In a market like the market here, where no close substitutes exist, customers are forced to pay supra-competitive prices for products when their prices increase industry-wide. Ceramic Substrates are an essential part of an automotive vehicle. No alternatives to Ceramic Substrates exist.

## D.      Opportunities To Collude

62.      Membership in industry trade associations afforded Defendants and their co-conspirators the opportunity to collude. Defendants attended industry events that provided the opportunity to meet without calling attention to their improper discussions and to perform acts in furtherance of the conspiracy. For example, Defendants and their co-conspirators have regularly attended the annual North American International Auto Show in Detroit, Michigan, and the Automotive Aftermarket Products Expo in Las Vegas, Nevada.

## E.      Defendants Conspired to Thwart Competition for Ceramic Substrates

63.      During the Class Period, Defendants and their co-conspirators formed an

international cartel to suppress and eliminate competition for Ceramic Substrates by agreeing to rig bids for, and to raise, fix, stabilize, or maintain the prices of, and allocate the market and customers for, Ceramic Substrates sold in or into the United States.

64.     Through meetings and communications that took place in the United States and elsewhere, Defendants and their co-conspirators discussed bids and price quotations for Ceramic Substrates to be submitted to automobile manufacturers in the United States and elsewhere.

65.     Through collusive, secretive meetings, telephone conversations, emails, and other communications, Defendants and their co-conspirators reached an agreement to restrict competition for bids and price quotations for Ceramic Substrates submitted to automobile manufacturers and agreed to rig bids and allocate the supply of Ceramic Substrates sold in the United States and elsewhere.

66.     Defendants and their co-conspirators then submitted as part of the RFQ process bids, price quotations, and price adjustments to the OEMs in the United States and elsewhere in accordance with their conspiratorial agreements.

67.     Defendants' meetings also served as a mechanism for Defendants to monitor and enforce adherence to the agreed-upon bid-rigging and price-fixing scheme.

68.     Defendants and their co-conspirators undertook measures to maintain the secretive nature of their unlawful conduct, including (but not limited to) using code names and meeting at private residences or remote locations.

69.     In addition, from at least February 2010 until July 2012, Defendant NGK obstructed justice by altering, concealing, or destroying evidence in order to hinder the investigation by the federal grand jury in the Eastern District of Michigan into possible federal criminal antitrust violations. Information concerning this conduct first came to light in an announcement by the DOJ

on September 3, 2015, as described below.

70.     Defendants and their co-conspirators knew and intended that their conduct would impact not only Ceramic Substrates sold to the OEMs as a result of the rigged bidding processes, but also the Ceramic Substrates sold to all direct purchasers throughout the United States.

71.     This was because the conspiracy permitted Defendants and their co-conspirators to fix, raise, maintain, and/or stabilize the prices paid by OEMs in order to set a floor for the prices paid by all other direct purchasers of Ceramic Substrates.

72.     As a result of the conspiracy, OEMs and all or nearly all other direct purchasers of Ceramic Substrates paid supra-competitive prices for those products.

## UNITED STATES GOVERNMENT INVESTIGATIONS OF THE CERAMIC SUBSTRATES MARKET AND RELATED INDUSTRIES

73.     Defendants are currently under investigation by the United States Department of Justice ("DOJ") for anticompetitive conduct in connection with the Ceramics Substrates industry.

**A.     Defendant NGK Has Been Charged With and Has Pleaded Guilty to Participating in a Conspiracy to Suppress and Eliminate Competition for Ceramic Substrates, and for Altering or Destroying Evidence**

74.     On September 3, 2015, the DOJ announced that NGK Insulators Ltd. agreed to plead guilty to a two-count criminal Information for its participation in a conspiracy to thwart competition for Ceramic Substrates in the United States and elsewhere. According to Count One, NGK agreed to rig bids for, and fixed, stabilized, or maintained the prices of Ceramic Substrates from at least as early as July 2000 through at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. According to Count Two, NGK altered, destroyed, mutilated, and concealed records, documents, and other objects, and had attempted to do so, with the intent to impair the objects' integrity and availability for use in the DOJ's criminal antitrust grand jury investigation. The DOJ imposed a criminal fine of $65.3 million for NGK's illegal conduct.

16

75.     The criminal Information filed by the DOJ stated that Defendant NGK Insulators Ltd. and its co-conspirators had carried out the Ceramic Substrates conspiracy by:

(a)     participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)     agreeing, in those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)     agreeing, in those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(d)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements;

(e)     supplying Ceramic Substrates to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(f)     accepting payment for Ceramic Substrates supplied to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(h)     employing measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

76.     With respect to the obstruction of justice count, the criminal Information filed against NGK Insulators Ltd. charged as follows:

Defendant and its executives and employees became aware that Defendant may be the subject of a criminal investigation in the United States. Specifically, Defendant and its certain employees first learned in February 2010 that the Federal Bureau of Investigation ("FBI") had executed a search warrant on the U.S. offices of the corporate co-conspirator of Defendant in the offense alleged in Count One, in connection with an investigation of

possible violations of U.S. antitrust law. Subsequently, between July and October 2011, Defendant and certain of its executives and employees learned that Defendant was under investigation by multiple law enforcement authorities, including law enforcement authorities in the U.S., in connection with the offense alleged in Count One.

Starting in or about February 20l0 and continuing until in our [sic] about July 2012, the exact dates being unknown to the United States, executives and employees of Defendant, acting on Defendant's behalf, corruptly altered, destroyed, mutilated and concealed records, documents and other objects and attempted to do so, with the intent to impair the objects' integrity and availability for use in an official proceeding, to wit, the federal grand jury sitting in the Eastern District of Michigan investigating, among other things, possible federal criminal antitrust violations occurring in the automotive parts industry and committed by Defendant and others, and otherwise obstructed, influenced and impeded said official proceeding and attempted to do so, in violation of 18 U.S.C. § 1512(c).

After becoming aware of the FBI search of U.S. offices of the coconspirator of Defendant, executives and employees deleted electronic documents and destroyed paper files likely to contain evidence of antitrust crimes in the United States and elsewhere. After becoming aware that Defendant was under investigation by multiple law enforcement authorities, including law enforcement authorities in the U.S. in connection with the offense alleged in Count One, executives and employees of defendant: (i) deleted and attempted to delete electronic files from the defendant's computer systems located in Japan; (ii) destroyed and concealed paper files located in Japan; (iii) removed and replaced office computers located in Japan; (iv) removed and concealed electronic files stored on the office computer system of Defendant's U.S. subsidiary located in the Eastern District of Michigan; (v) attempted to destroy paper files located at Defendant's U.S. subsidiary in the Eastern District of Michigan; and (vi) engaged in misleading conduct and withheld information about the offense alleged in Count One, as well as certain obstructive acts described above, and attempted to cause others to also mislead and withhold such information.

**B.   Defendant Corning Has Been Charged With and Has Pleaded Guilty to Participating in a Conspiracy to Suppress and Eliminate Competition for Ceramic Substrates**

77.   On May 16, 2016, the DOJ announced that Corning International K.K. had agreed

to pay a $66.5 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Ceramic Substrates sold in the United States and elsewhere and used in the emissions control systems of automobiles manufactured and/or sold in the United States and elsewhere, beginning at least as early as July 1999 and continuing until on or about July 2011, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

78.    A former employee of Defendant Corning Int'l K.K. has also been indicted. In May 2016, the DOJ indicted Nobuhiko Niwa for his alleged participation in a conspiracy to fix prices, rig bids, and allocate the market for Ceramic Substrates sold in the United States and elsewhere. Mr. Niwa, a Japanese national, was indicted for participating in the conspiracy from July 1999 to July 2011, when he worked first as Director, then Senior Director, of Corning's Mobile Emissions Division.

79.    Corning's plea agreement states that personnel working at Corning Int'l K.K. provided services to Corning Incorporated related to the marketing and sales of Ceramic Substrates manufactured by Corning Incorporated in the United States. Corning Incorporated manufactured Ceramic Substrates in Erwin, New York and Blacksburg, Virginia for use in automobiles manufactured and/or sold in the United States.

80.    According to the criminal Information, Defendant Corning Int'l K.K. and its co-conspirators carried out the Ceramic Substrates conspiracy by:

> (a)    participating in meetings and communications to coordinate bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices and to coordinate on market share in the United States and elsewhere;
>
> (b)    directing, authorizing, and consenting to the participation of subordinate

<div style="margin-left:2em">

employees in such meetings;

(c)    agreeing, in those meetings and communications, to allocate market shares and customers in the United States and elsewhere;

(d)    agreeing, in those meetings and communications, to coordinate pricing to be submitted to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(e)    agreeing, in those meetings and communications, not to compete against each other on certain bids by submitting intentionally collusive and noncompetitive bids to certain automobile manufacturers in the United States and elsewhere;

(f)    exchanging, in those meetings and communications, manufacturing capacity and sales volume information in the United States and elsewhere;

(g)    agreeing, in those meetings and communications, to coordinate price adjustments requested by certain automobile manufacturers in the United States and elsewhere;

(h)    negotiating prices and submitting bids, price quotations, and price adjustments to certain automobile manufacturers in the United States and elsewhere in accordance with the illegal agreements reached;

(i)    supplying Ceramic Substrates to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(j)    accepting payment for Ceramic Substrates sold in the United States and elsewhere at collusive and noncompetitive prices.

</div>

**C.    Defendant DENSO Has a History of Colluding to Fix Prices in Related Markets**

81.    Defendant DENSO has a history of criminal collusion, and has pleaded guilty to participating in price-fixing cartels in other auto parts investigations. Evidence of Defendants' other price-fixing crimes is admissible pursuant to Federal Rule of Evidence 404(b), because Defendants' past criminal acts tend to show a specific pattern of price-fixing behavior and planning between Defendants repeated across very similar industries and among repeat players in these industries.

82.    On March 5, 2012, DENSO admitted and pleaded guilty to participating in the

conspiracy from at least as early as January 2000 until at least February 2010 to rig bids for, and to fix, stabilize, and maintain prices of Electronic Control Panels ("ECUs") and Heater Control Panels ("HCPs") sold in the United States and elsewhere. In connection with the guilty plea, DENSO agreed to pay a total of $78 million in criminal fines.

83.     Further, several of DENSO's high-ranking executives have pleaded guilty to criminal price-fixing in the automotive parts industry. This includes: Norihiro Imai, an executive of DENSO, who agreed to serve roughly one year in a U.S. prison and pay a $20,000 criminal fine; Makoto Hattori, an executive of DENSO, who agreed to serve fourteen months in a U.S. prison and pay a $20,000 criminal fine; Yuji Suzuki, an executive of DENSO, who agreed to serve a sixteen-month U.S. prison sentence and pay a $20,000 criminal fine; Hiroshi Watanabe, an executive of DENSO, who agreed to serve fifteen months in a U.S. prison and pay a $20,000 criminal fine; and Satoru Horisaki, an executive of DENSO, who agreed to serve roughly one year in a U.S. prison and pay a $20,000 criminal fine. In addition, a former executive of DENSO— Kazuaki Fujitani—agreed plead guilty to obstruction of justice charges in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in cars sold to the United States.

84.     The guilty pleas made by executives of DENSO in other auto parts cases make it plausible that DENSO executives are guilty of engaging in a conspiracy to thwart competition in the Ceramic Substrates market as well.

**D.     Likely Existence of Amnesty Applicant**

85.     An amnesty applicant likely applied to the DOJ for leniency in this case. The U.S. Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ.

According to DOJ guidelines, a corporate amnesty applicant must "admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." However, these guidelines provide that

> [a] company that argues that an agreement to fix prices, rig bids, restrict capacity or allocate markets might be inferred from its conduct but cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of a criminal antitrust violation to be eligible for leniency. A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency.

86.     In light of the multiple guilty pleas in this case, and those in related automotive parts antitrust cases, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case. By applying for leniency through ACPERA, the cartel member must have admitted to anticompetitive conduct in the Ceramic Substrates industry.

**E.     Governmental Investigations In the Auto Parts Industry Reveal that Anti-Competitive Conduct is Wide-Spread.**

87.     The automotive parts industry is and has been under investigation by multiple domestic and international organizations, including enforcers in the United States, Canada, Korea, Japan, and the European Union. These investigations have revealed that collusive, anti-competitive conduct is rampant throughout the automotive parts industry.

88.     In fact, in a January 30, 2012 DOJ press release, the Acting Assistant Attorney General of the DOJ's Antitrust Division, Sharis A. Pozen, stated that the auto parts antitrust investigation is "the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct." The enormous scale of anticompetitive conduct in the auto parts industry was acknowledged by FBI Special Agent in Charge Andrew G. Arena, who said that "[t]his criminal activity has a

significant impact on the automotive manufacturers in the United States, Canada, Japan, and Europe and had been occurring [for] at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."

89.     As of April 2017, the Department of Justice's auto parts investigation has resulted in charges against 48 companies and 65 individuals. In total, 32 executives have pleaded guilty and been sentenced to an average of just over 15 months in jail. Additionally, 44 corporations have pleaded guilty or agreed to plead guilty and have agreed to pay more than $2.9 billion in criminal fines. The auto parts industry is saturated with anticompetitive conduct.

**PLAINTIFFS' CLAIMS ARE TIMELY**

90.     Throughout the Class Period, Defendants affirmatively and fraudulently concealed their anti-competitive conduct from Plaintiffs and the Class.

91.     Despite due diligence, Plaintiffs and members of the Class did not learn or discover, and could not have learned or discovered, the existence of the conspiracy alleged herein until September 3, 2015, the date when investigations into price fixing in the Ceramic Substrates industry by antitrust regulators first became public. Because Defendants kept their conspiracy secret prior to September 3, 2015, Plaintiffs and the Class were unaware of Defendants' unlawful conduct, or that they were paying artificially high prices for Ceramic Substrates.

92.     Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy with respect to Ceramic Substrates, taking affirmative acts to conceal their misconduct. For example, Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral. In making those false representations, Defendants misled Plaintiffs and members of the Class as to the collusive and coordinated nature of their price fixing, bid rigging, and supply allocation.

93.     Moreover, Defendants employed certain measures, including (but not limited to) using code names and meeting at private residences or in remote locations.

94.     By its very nature, Defendants' contract, combination, or conspiracy was inherently self-concealing. Moreover, because Ceramic Substrates are not exempt from antitrust regulation, and because the price of Ceramic Substrates was set through an RFQ process that Plaintiffs and members of the Class has reason to believe was competitive, Plaintiffs and members of the Class reasonably believed they were making Ceramic Substrate purchases in a competitive industry.

95.     At least one Defendant has pleaded guilty to purposefully destroying evidence to avoid detection. The Plea Agreement for Defendant NGK Insulators, Ltd. states:

> In February, 2010, certain sales employees of the defendant learned that offices of its co-conspirator's U.S. subsidiary located in the Eastern District of Michigan had been searched by U.S. law enforcement personnel during an investigation of possible violations of antitrust laws in the auto parts industry. Subsequently, between July and October 2011, certain high-level executives and sales employees of the defendant learned that the defendant was itself under investigation by multiple law enforcement authorities throughout the world, including law enforcement authorities in the United States. Between February 2010 and July 2012, certain high-level executives and other employees of the defendant took various actions to destroy, conceal or withhold evidence of the conspiracy described above with the intent to obstruct, influence or impede an official proceeding investigating potential violations of United States antitrust law or other potential violations of United States law.

96.     As described above, at least one Defendant has admitted to altering, destroying, mutilating and/or concealing records, documents or other objects.

97.     The affirmative acts taken by Defendants and their co-conspirators to conceal the conspiracy alleged herein, coupled with the inherently secretive nature of the conspiracy, prevented Plaintiffs and the Class from knowing about Defendants' wrongful acts. Defendants' acts of concealment were sufficient to prevent a reasonable customer from suspecting that

Defendants conspired to fix prices in the Ceramic Substrates industry.

98.      In sum, Plaintiffs and members of the Class did not and could not have discovered Defendants' unlawful contract, combination, or conspiracy prior to September 3, 2015, despite due diligence, because Defendants took affirmative acts to fraudulently conceal their conspiracy.

99.      As a result of Defendants' fraudulent concealment of the conspiracy, the statute of limitations applicable to Plaintiffs and the Class's claims did not begin to run, or was otherwise tolled, until September 3, 2015.

## ANTITRUST INJURY

100.      Defendants' conspiracy suppressed price competition among Defendants and their co-conspirators, causing the prices for Ceramic Substrates to be artificially inflated throughout the Class Period.

101.      As a result, Plaintiffs and members of the Class paid supra-competitive prices for Ceramic Substrates and were deprived of the benefits of a competitive market throughout the Class Period.

102.      As a direct and foreseeable result of Defendants' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for Ceramic Substrates than they would have in the absence of Defendants' unlawful and anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

103.      Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3).  The Class is defined as follows:

> All individuals and entities that purchased Ceramic Substrates (excluding Defendants and their past and present parents,

subsidiaries, affiliates and joint-ventures) in the United States directly from one or more Defendants (or their controlled subsidiaries, affiliates, joint-ventures, or entities of which they are the ultimate parent) from July 1, 1999, through May 16, 2016.

104.    Plaintiffs do not know the exact number of Class members, such information being in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

105.    There are questions of law or fact common to the class, including:

(a)    Whether Defendants engaged in a contract, combination, or conspiracy to rig bids for, or to raise, fix, maintain, or stabilize prices of, Ceramic Substrates sold in the United States;

(b)    The identity of the conspiracy's participants;

(c)    The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether Defendants agreed to allocate the supply of Ceramic Substrates sold to direct purchasers in the United States;

(e)    Whether Defendants' conduct caused Ceramic Substrates to be sold in the United States at artificially high prices;

(f)    Whether Defendants fraudulently concealed their conspiracy from Ceramic Substrates purchasers in the United States;

(g)    Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

(h)    Whether Plaintiffs and other members of the Class are entitled to injunctive relief and, if they are, the nature and extent of such relief.

106.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

107.    Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the antitrust laws, in that they paid

artificially inflated prices for products purchased directly from Defendants. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of other Class members. Plaintiffs' interests coincide with, and not antagonistic to, those of other Class members.

108.    Plaintiffs will fairly and adequately represent the interests of the Class in that they are direct purchasers of Ceramic Substrates and have no conflict with any other member of the Class. Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

109.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

110.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

111.    A class action is superior to alternative methods for the fair and efficient adjudication of this controversy. Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation, and there are no inherent barriers to managing the case as a class action. The Class is readily definable, including by records that likely exist in the files of Defendants and their co-conspirators. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This action presents no difficulties in management that would preclude maintenance of a class action.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)

112.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

113.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Ceramic Substrates sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

114.    The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for Ceramic Substrates sold in the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

115.    Defendants succeeded in rigging bids for and in fixing, raising, maintaining, or stabilizing the prices of Ceramic Substrates sold in the United States during the Class Period.

116.    For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they conspired to do, including:

    (a)    Participating in meetings and conversations in the United States and elsewhere to discuss the bids and price quotations for Ceramic Substrates to be submitted to direct purchasers in the United States;

    (b)    Agreeing on bids and price quotations to be submitted to direct purchasers in the United States;

    (c)    Agreeing to manipulate prices and allocate supply of Ceramic Substrates sold in the United States in a manner that deprived direct purchasers of free and open competition;

    (d)    Agreeing to coordinate price adjustments in the United States;

    (e)    Submitting bids, price quotations, and price adjustments to direct

purchasers of Ceramic Substrates in accordance with the agreements reached;

(f)     Selling Ceramic Substrates to direct purchasers in the United States at noncompetitive prices; and

(g)     Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

117.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses or property in that they have paid more for Ceramic Substrates than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment for them and on behalf of the Class, and respectfully request the following relief:

A.     That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act;

C.     That Plaintiffs and members of the Class recover their damages, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be trebled in accordance with 15 U.S.C. §15(a);

D.     That Defendants and their subsidiaries, affiliates, successors, transferees, assignees, and their respective officers, directors, partners, agents and employees, and all other persons

acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest; and

G.      That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

<center>**JURY DEMAND**</center>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: November 21, 2017          /s/ David H. Fink_____
                                  David H. Fink (P28235)
                                  Darryl Bressack (P67820)
                                  Nathan J. Fink (P75185)
                                  **FINK + ASSOCIATES LAW**
                                  38500 Woodward Ave; Suite 350
                                  Bloomfield Hills, MI 48304
                                  Telephone: (248) 971-2500
                                  dfink@finkandassociateslaw.com
                                  dbressack@finkandassociateslaw.com
                                  nfink@finkandassociateslaw.com

                                  Solomon B. Cera
                                  Thomas B. Bright
                                  Colleen L. Cleary
                                  **CERA LLP**
                                  595 Market Street, Suite 2300
                                  San Francisco, CA 94105-2835
                                  Telephone: (415) 777-2230
                                  scera@cerallp.com
                                  tbright@cerallp.com
                                  ccleary@cerallp.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
**PRETI, FLAHERTY, BELIVEAU**
**& PACHIOS LLP**
One City Center, P.O. Box 9546
Portland, ME 04101
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4510
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN & KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone:(215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

M. John Dominguez
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 204
Palm Beach Gardens, FL  33410
Telephone: (877) 515-7955
jdominguez@cohenmilstein.com

David A. Young
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
dyoung@cohenmilstein.com

Matthew W. Ruan
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
mruan@cohenmilstein.com

*Counsel for Plaintiffs and the Proposed Class*