**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| IN RE: CERAMIC SUBSTRATES | |
| THIS RELATES TO: DIRECT PURCHASER ACTIONS | 2:17-cv-13785-MOB-MKM **ORAL ARGUMENT REQUESTED** |

**NOTICE OF CERAMIC SUBSTRATES DEFENDANTS'**
**JOINT MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS'**
**CLASS ACTION COMPLAINT**

PLEASE TAKE NOTICE that, by their counsel listed below, Defendants Corning Incorporated, Corning International Kabushiki Kaisha, DENSO Corporation, DENSO International America, Inc., NGK Insulators, Ltd., and NGK Automotive Ceramics USA, Inc. respectfully move this Court for an Order, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), dismissing all claims against Defendants. This motion is based on the supporting brief and Request for Judicial Notice submitted herewith, as well as oral argument of counsel and such other and further material as the Court may consider.

As required by Local Rule 7.1(a), counsel for Defendants sought concurrence from counsel for the Direct Purchaser Plaintiffs on July 6, 2018 by telephone. Counsel for Defendants generally explained the nature of this motion and its legal basis and requested, but did not obtain, concurrence in the relief sought (*i.e.*, dismissal of the Class Action Complaint).

Dated: July 6, 2018     Respectfully submitted,


WINSTON & STRAWN LLP

By: */s/ Jeffrey L. Kessler*
  Jeffrey L. Kessler
  Jeffrey J. Amato
  Angela A. Smedley
  WINSTON & STRAWN LLP
  200 Park Avenue
  New York, NY 10166
  Telephone: (212) 294-6700
  Facsimile: (212) 294-4700
  jkessler@winston.com
  jamato@winston.com
  asmedley@winston.com

  Tiffany R. Rohrbaugh
  SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP
  1440 New York Avenue, NW
  Washington, DC 20005
  Telephone: (202) 371-7000
  Facsimile: (202) 661-9139
  tiffany.rider@skadden.com

  *Counsel for Corning Incorporated and*
  *Corning International Kabushiki Kaisha*


  MCDERMOTT WILL & EMERY, LLP
  Stefan M. Meisner (DC Bar No. 467886)
  Daniel G. Powers (DC Bar No. 997749)
  Emre N. Ilter (DC Bar No. 984479)
  Lisa A. Peterson (DC Bar No. 1020986)
  500 North Capitol Street, N.W.
  Washington, DC  20001
  (202) 756-8000
  smeisner@mwe.com
  dgpowers@mwe.com
  eilter@mwe.com
  lpeterson@mwe.com

  O'REILLY RANCILIO, P.C.
  James C. Thomas (P23801)
  Local Counsel to Defendant,

NGK Insulators, Ltd.
12900 Hall Road, Suite 350
Sterling Heights, MI 48313
586-726-1000
jthomas@orlaw.com

*Attorneys for NGK Insulators, Ltd.*
*and NGK Automotive Ceramics USA, Inc.*

*/s/ Steven F. Cherry*
Steven F. Cherry
David P. Donovan
Seth Bastianelli
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
steven.cherry@wilmerhale.com
david.donovan@wilmerhale.com
seth.bastianelli@wilmerhale.com

*Attorneys for Defendants DENSO Corporation*
*and DENSO International America, Inc.*

Steven M. Zarowny (P33362)
General Counsel
DENSO International America, Inc.
24777 Denso Drive
Southfield, MI 48033
Tel.: (248) 372-8252
Fax: (248) 213-2551
steve_zarowny@denso-diam.com

*Attorney for Defendant DENSO International*
*America, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 |
| | Honorable Marianne O. Battani |
| IN RE: CERAMIC SUBSTRATES | |
| THIS RELATES TO: | 2:17-cv-13785-MOB-MKM |
| DIRECT PURCHASER ACTIONS | **ORAL ARGUMENT REQUESTED** |

**<u>BRIEF IN SUPPORT OF CERAMIC SUBSTRATES DEFENDANTS' MOTION TO
DISMISS DIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT</u>**

## STATEMENT OF THE ISSUES PRESENTED

I.     Whether the Court should dismiss Plaintiffs' claims for lack of subject-matter jurisdiction, and for failure to state a claim, because Plaintiffs do not have Article III standing and have not pled antitrust standing, where Plaintiffs (i) did not actually purchase the Ceramic Substrates that were the subject of the alleged conspiracy and thus did not suffer injury from the conspiracy they alleged, and (ii) are purchasers of industrial emissions control products in separate markets that are not inextricably intertwined with the relevant market for Ceramic Substrates, and thus are too remote from the alleged conduct to have suffered antitrust injury as a result of the alleged conduct.

II.     Whether Plaintiffs have failed to plausibly allege that Ceramic Substrate sales made outside of the United States to entities outside of the United States fall within an exception to the Foreign Trade Antitrust Improvements Act, as one of the Plaintiffs is a Canadian company that has not alleged that it made any purchases of Ceramic Substrates in the United States.

III.     Whether Plaintiffs' federal antitrust claims are time-barred under the applicable four-year statute of limitations because (i) the latest incidence of injurious conduct is alleged to have occurred more than four years before Plaintiffs initiated this action, and/or (ii) Defendants' public disclosure of the DOJ investigation put Plaintiffs on inquiry notice of their claims more than four years before Plaintiffs initiated this action.

## STATEMENT OF CONTROLLING LAW OR MOST APPROPRIATE AUTHORITIES

**Plaintiffs Fail to State a Claim**

- *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)
- *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)
- *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)

**Plaintiffs Do Not Have Article III Standing to Bring Their Claims**

- *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)
- *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)
- *Murry v. Mich. Dep't of Corr.*, No. 07-14126, 2008 WL 126157 (E.D. Mich. Jan. 11, 2008)
- *Ray v. PPOM, L.L.C.*, No. 04-60287, 2005 WL 1984470 (E.D. Mich. Aug. 9, 2005)

**Plaintiffs Cannot Establish Antitrust Standing**

- *Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*")
- *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982)
- *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387 (6th Cir. 2012), *aff'd*, 134 S. Ct. 1377 (2014)
- *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir. 1983)

**The FTAIA Bars Nett's Claims**

- *F. Hoffman-LaRoche, Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004)
- *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2016 WL 6138600 (E.D. Mich. Oct. 21, 2016)
- *In re Bearings*, No. 2:12-cv-00500, 2014 WL 4209588 (E.D. Mich. Aug. 26, 2014)

- *In re DRAM Antitrust Litigation*, 546 F.3d 981 (9th Cir. 2008)
- *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535 (8th Cir. 2007)
- *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955 (N.D. Cal. 2011)
- *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 09-1827 SI, C 09-5840 SI, 2010 WL 2610641 (N.D. Cal. June 28, 2010)
- *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007)

**The Statute of Limitations Bars Plaintiffs' Claims**

- *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)
- *O'Shea v. Littleton*, 414 U.S. 488 (1974)
- *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014)
- *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401 (6th Cir. 1999)
- *Peck v. Gen. Motors Corp.*, 894 F.2d 844 (6th Cir. 1990)

**There Is No Basis to Toll the Statute of Limitations**

- *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)
- *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445 (6th Cir. 1988)
- *Campbell v. Upjohn Co.*, 676 F.2d 1122 (6th Cir. 1982)
- *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975)

- *Farag v. Health Care Serv. Corp.*, No. 17 C 2547, 2017 WL 2868999 (N.D. Ill. July 5, 2017)

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 2

LEGAL STANDARDS ............................................................................................. 5

ARGUMENT ............................................................................................................ 8

I.      Plaintiffs' Complaint Should Be Dismissed Because They Cannot Establish Either Article III Or Antitrust Standing .............................................................. 8

        A.      Plaintiffs Cannot Establish Article III Standing Because They Are Manufacturers Of Industrial Products That Did Not Purchase Ceramic Substrates For Automotive Applications And Therefore Suffered No Injury From The Alleged Conspiracy .................................................. 9

        B.      Plaintiffs Are Also Too Remote To Have Any Antitrust Injury Or Standing ............................................................................................. 12

                1.      Plaintiffs Have Not Pled An Adequate Causal Connection Between The Alleged Conspiracy In The Relevant Market And Their Alleged Harm Outside Of That Market .................................... 13

                2.      Plaintiffs Have Not Pled That They Suffered Any Injury In An Inextricably Linked And Intertwined Market ........................... 17

                3.      Plaintiffs Have Not Pled That They Suffered Any Injury That Meets The "Directness" Requirement For Antitrust Standing ................ 20

                4.      The Speculative Nature Of Plaintiffs' Damages (If Any) Further Weighs Against Finding Antitrust Standing ............................. 22

                5.      Automotive Purchasers Of Ceramic Substrates Would Be More Efficient Enforcers Of The Antitrust Laws ............................... 23

        C.      Plaintiffs Also Do Not Have Standing To Seek Injunctive Relief ....................... 23

II.     The FTAIA Bars Nett's Claims .................................................................. 24

III.    Plaintiffs' Claims Are Time-Barred .......................................................... 29

        A.      Plaintiffs' Claims Are Time-Barred Based On The Last Alleged Date Of Conduct .......................................................................................... 30

B.    There Is No Basis To Toll The Statute Of Limitations And, Even If There Were, Plaintiffs' Claims Lapsed By March 30, 2016 .......................................... 32

CONCLUSION ................................................................................................................. 36

# TABLE OF AUTHORITIES

Cases ........................................................................................................................ Page(s)

*Am. Pan Co. v. Lockwood Mfg., Inc.,*
  No. C-3-06-197, 2008 WL 471685 (S.D. Ohio Feb. 15, 2008) ............................................... 24

*Arellano v. Continuing Care Risk Retention Group Inc.,*
  No. CV 11-01058 MMM, 2011 WL 13217934 (C.D. Cal. June 9, 2011) ............................... 8

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................................ 6

*Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983) ........................................................................................ 8, 12, 13, 23

*Barnosky Oils, Inc. v. Union Oil Co. of Cal.,*
  665 F.2d 74 (6th Cir. 1981) ........................................................................................... 31

*In re Bearings,*
  50 F. Supp. 3d 836 (E.D. Mich. 2014) ...................................................................... 6, 23

*In re Bearings,*
  No. 2:12-cv-00500, 2014 WL 4209588 (E.D. Mich. Aug. 26, 2014) ................................. 25

*In re Bearings,*
  No. 2:12-cv-00501, 2014 WL 4272772 (E.D. Mich. Aug. 29, 2014) ................................. 16

*Bedford v. Michigan,*
  722 F. App'x 515 (6th Cir. 2018) .................................................................................. 7

*Blue Shield of Virginia v. McCready,*
  457 U.S. 465 (1982) ................................................................................... 18, 19, 21, 23

*Campbell v. Upjohn Co.,*
  676 F.2d 1122 (6th Cir. 1982) ................................................................................. 35, 36

*Cargill, Inc. v. Monfort of Colo., Inc.,*
  479 U.S. 104 (1986) ...................................................................................................... 24

*Carpet Group Int'l v. Oriental Rug Imps. Ass'n,*
  227 F.3d 62 (3d Cir. 2000) ........................................................................................... 26

*Carrier Corp. v. Outokumpu Oyj,*
  673 F.3d 430 (6th Cir. 2012) ............................................................................... 6, 33, 34

*Caruana v. Gen. Motors Corp.,*
  204 F. App'x 511 (6th Cir. 2006) ................................................................................. 13

*In re Ceramic Substrates*,
   Nos. 2:16-cv-3802, -3803, 2017 WL 7689654 (E.D. Mich. May 5, 2017) ..................7, 29, 31

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ........................................................................................8

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
   523 F.2d 389 (6th Cir. 1975) ...................................................................................32, 33

*United States ex rel. Dingle v. BioPort Corp.*,
   270 F. Supp. 2d 968 (W.D. Mich. 2003) .......................................................................8

*DLX, Inc. v. Kentucky*,
   381 F.3d 511 (6th Cir. 2004) .........................................................................................5

*Duncan v. Muzyn*,
   885 F.3d 422 (6th Cir. 2018) .........................................................................................9

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ...................................................................22, 27

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*,
   417 F.3d 1267 (D.C. Cir. 2005)...........................................................................24, 27, 28

*Energy Automation Sys., Inc. v. Saxton*,
   618 F. Supp. 2d 807 (M.D. Tenn. 2009)........................................................................8

*F. Hoffman-LaRoche, Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004)........................................................................................................27, 29

*Farag v. Health Care Serv. Corp.*,
   No. 17 C 2547, 2017 WL 2868999 (N.D. Ill. July 5, 2017) ....................................33

*In re Flash Memory Antitrust Litig.*,
   No. C 07–0086 SBA, 2010 WL 2465329 (N.D. Cal. June 10, 2010)....................................11

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015)............................................................................28

*Gaudin v. KDI Corp.*,
   576 F.2d 708 (6th Cir. 1978) .......................................................................................32

*Grand Rapids Plastics, Inc. v. Lakian*,
   188 F.3d 401 (6th Cir. 1999) .......................................................................................30

*Hamilton Cty. Bd. of Comm'rs v. NFL*,
   491 F.3d 310 (6th Cir. 2007) .......................................................................................33

*In re Hydrogen Peroxide Antitrust Litig.*,
    702 F. Supp. 2d 548 (E.D. Pa. 2010) ....................................................26

*In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*,
    172 F. Supp. 3d 724 (D.N.J. 2016) .......................................................34

*Lavoho, LLC v. Apple Inc.*,
    71 F. Supp. 3d 395 (S.D.N.Y. 2014)......................................................25

*In re Lehman Bros. Secs & ERISA Litig.*,
    684 F. Supp. 2d 485 (E.D.N.Y 2010) ...................................................11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................6, 11

*Minn-Chem, Inc. v. Agrium, Inc.*,
    683 F.3d 845 (7th Cir. 2012) ..............................................................27

*In re Monosodium Glutamate Antitrust Litig.*,
    477 F.3d 535 (8th Cir. 2007) .........................................................28, 29

*Murry v. Mich. Dep't of Corr.*,
    No. 07-14126, 2008 WL 126157 (E.D. Mich. Jan. 11, 2008) ...........5, 10

*NAACP v. Snyder*,
    879 F. Supp. 2d 662 (E.D. Mich. 2012)..................................................8

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) .................................................................6

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)............................................................................31

*Pearce v. Faurecia Exhaust Sys., Inc.*,
    529 F. App'x 454 (6th Cir. 2013) .......................................................7, 8

*Peck v. Gen. Motors Corp.*,
    894 F.2d 844 (6th Cir. 1990) ..............................................................30

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
    838 F.2d 1445 (6th Cir. 1988) .......................................................33, 36

*Ray v. PPOM, L.L.C.*,
    No. 04-60287, 2005 WL 1984470 (E.D. Mich. Aug. 9, 2005)..........5, 10

*In re Refrigerant Compressors Antitrust Litig.*,
    No. 2:09-md-02042, 2016 WL 6138600 (E.D. Mich. Oct. 21, 2016) ....25

*In re Rubber Chems. Antitrust Litig.*,
  504 F. Supp. 2d 777 (N.D. Cal. 2007) .................................................................26

*Schmidt v. Skolas*,
  770 F.3d 241 (3d Cir. 2014)...............................................................................7

*Southaven Land Co., Inc. v. Malone & Hyde, Inc.*,
  715 F.2d 1079 (6th Cir. 1983) ......................................................12, 13, 17, 22, 23

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016)...................................................................................6, 9

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
  697 F.3d 387 (6th Cir. 2012), *aff'd*, 134 S. Ct. 1377 (2014) ....................13, 16, 17, 18, 20, 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  781 F. Supp. 2d 955 (N.D. Cal. 2011) ...............................................................27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  Nos. M 09-1827 SI, C 09-5840 SI, 2010 WL 2610641 (N.D. Cal. June 28,
  2010) ....................................................................................................26, 28

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  Nos. M 07-1827 SI, C 10-4945 SI, 2012 WL 273761 (N.D. Cal. Jan. 30,
  2012)……………………………………………………………………………………………34

*Thomas v. Noder-Love*,
  621 F. App'x. 825 (6th Cir. 2015) ....................................................................7, 8

*United States v. Bd. of Cty. Comm'rs of Hamilton Cty., Ohio*,
  No. 1:02-CV-00107, 2010 WL 200326 (S.D. Ohio Jan. 14, 2010)...........................8

*United States v. Ritchie*,
  15 F.3d 592 (6th Cir. 1994) .............................................................................5

*Valley Prods. Co. v. Landmark*,
  128 F.3d 398 (6th Cir. 1997) ..........................................................................24

*Venture Glob. Eng'g, LLC v. Satyam Computer Servs., Ltd.*,
  730 F.3d 580 (6th Cir. 2013) ..........................................................................33

*Webasto Thermo & Comfort N. Am., Inc. v. Bestop, Inc.*,
  No. 16-CV-13456, 2017 WL 4535290 (E.D. Mich. Oct. 11, 2017)..........................7

*In re Wire Harness*,
  No. 2:12-cv-00102, -00103, 2013 WL 2456612 (E.D. Mich. June 6, 2013).................. *passim*

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ................................................................31

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)........................................................................31

**Statutes**

15 U.S.C. § 6a ............................................................................................24

15 U.S.C. § 26 ............................................................................................23

18 U.S.C. § 31(a)(6) (2018) ......................................................................16

**Other Authorities**

Fed. R. Civ. P. 8(a)(2) ................................................................................6

Fed. R. Civ. P. 9(b) ..................................................................................33

Fed. R. Civ. P. 12(b)(1)..........................................................................5, 6

Fed. R. Civ. P. 12(b)(6)..............................................................................6

Fed. R. Evid. 201(b)(2), (c)(2), (d) ............................................................7

## **INTRODUCTION**

Plaintiffs Nett Technologies Inc. ("Nett") and Airflow Catalyst Systems, Inc. ("Airflow") are not automotive Original Equipment Manufacturers ("OEMs"), but rather companies operating in the ***industrial*** emissions control markets (*i.e.*, emissions control systems for mining, marine, and other sorts of industrial equipment).  Nonetheless, Plaintiffs claim, implausibly, that they were damaged by a price-fixing conspiracy they allege targeted *automotive* ceramic substrates.  *See* Compl. ¶ 3 (defining "Ceramic Substrates" as products used in automotive catalytic converters). These industrial companies allege no facts that they purchased "Ceramic Substrates," nor facts that would link their alleged purchases to the expressly pled conspiracy targeting automotive OEMs. Indeed, Plaintiffs provide no information whatsoever about their alleged purchases.  These deficiencies, among other material flaws in their claims, require the dismissal of Plaintiffs' Complaint on several grounds.

*First*, Plaintiffs lack Article III and antitrust standing.  Because both Plaintiffs are manufacturers of emissions control products for industrial equipment and do not manufacture products for automotive applications, they are not participants in the relevant market for Ceramic Substrates (the market that is the sole subject of the alleged conspiracy) and thus cannot claim any harm from the conspiracy alleged.  Any injury allegedly sustained by Plaintiffs in connection with the alleged Ceramic Substrates conspiracy would be too indirect and remote to confer either Article III standing or antitrust standing for Plaintiffs to pursue these claims under the Clayton Act.  All of Plaintiffs' allegations should accordingly be dismissed both for failure to state a claim and for lack of subject-matter jurisdiction.

*Second*, Plaintiff Nett is a foreign company located in Canada that purports to represent a putative class of Ceramic Substrates purchasers in the United States, without having itself plausibly pled that its own alleged foreign purchases satisfy an exception to the Foreign Trade

Antitrust Improvements Act ("FTAIA").   As a foreign plaintiff, Nett has the burden of affirmatively alleging that it meets an exception to the FTAIA's bar against foreign claims.  Its wholesale failure to do so requires that those claims be dismissed as barred by the FTAIA.

*Third*, assuming in the alternative that Plaintiffs were to have plausibly alleged participation in the market relevant to the alleged conspiracy, Plaintiffs filed this suit on November 21, 2017, at least nineteen months too late.  Beginning March 30, 2012, and each and every quarter thereafter, Corning Incorporated disclosed in public securities filings the government's investigation into Ceramic Substrates and the same conduct upon which Plaintiffs' claims are now based.   To the extent that Plaintiffs allege they were direct purchasers of Ceramic Substrates, Plaintiffs either knew or reasonably should have known that there was a claim they needed to pursue within the limitations period.  This case is thus distinguishable from the cases filed by the indirect purchasers in the End Payor and Auto Dealer actions, who were found not to have been put on notice by such filings because of their market position and the speculative nature of the damages incurred on their downstream purchase of automobiles.  The Complaint here should thus be dismissed, in its entirety, as time-barred.

## FACTUAL BACKGROUND

Industrial equipment manufacturers Airflow and Nett allege that, from July 1, 1999 through May 16, 2016, Defendants NGK Insulators, Ltd., NGK Automotive Ceramics USA, Inc., Corning International Kabushiki Kaisha, Corning Incorporated, DENSO Corporation, and DENSO International America, Inc. (collectively, "Defendants") "engaged in a global conspiracy to fix, maintain and/or stabilize prices, rig bids, and/or allocate the market and customers for Ceramic Substrates in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1." Compl. ¶¶ 1, 5.  Plaintiffs' Complaint not only *defines* "Ceramic Substrates" as products used in

*automotive* catalytic converters, *see* Compl. ¶ 3, but it further repeatedly specifies that the Defendants accomplished their alleged conspiracy by fixing prices of Ceramic Substrates by rigging bids submitted to *automobile manufacturers*. *See, e.g.*, Compl. ¶ 5 ("Defendants' cartel effectively fixed, maintained, or stabilized prices of Ceramic Substrates by rigging bids, price quotations, and price adjustments submitted to ***automobile*** manufacturers in the United States and elsewhere.") (emphasis added); ¶ 65 ("Defendants and their co-conspirators reached an agreement to restrict competition for bids and price quotations for Ceramic Substrates submitted to ***automobile*** manufacturers and agreed to rig bids and allocate the supply of Ceramic Substrates sold in the United States and elsewhere.") (emphasis added).

Plaintiffs allege that OEMs "such as ***automotive*** manufacturers . . . Ford Motor Company, Toyota Corporation, and General Motors . . . purchase Ceramic Substrates directly from Defendants." Compl. ¶ 39 (emphasis added). These automotive OEMs are alleged to have procured Ceramic Substrates by issuing Requests for Quotations ("RFQs") "to ***automotive*** parts suppliers on a model-by-model basis for model-specific parts," and then selecting a winning bid from those submitted by competing substrates suppliers. Compl. ¶¶ 42–43 (emphasis added). The gravamen of Plaintiffs' Complaint is that Defendants, "[t]hrough meetings and communications that took place in the United States and elsewhere," conspired to "restrict competition for bids and price quotations for Ceramic Substrates submitted to ***automobile*** manufacturers and agreed to rig bids and allocate the supply of Ceramic Substrates sold in the United States and elsewhere." Compl. ¶¶ 64–65 (emphasis added).

In stark contrast to the Complaint's unwavering focus on the automotive market, *neither* Plaintiff actually manufactures automotive equipment or alleges that it participated in the automotive market. Nor do Plaintiffs provide any facts to show any connection between the

3

automobile market and the industrial market in which they operate.  Plaintiffs do not allege that they manufacture automotive catalytic converters, the end-use product of which Ceramic Substrates are a component, nor that they even are involved in the automotive replacement or aftermarket catalytic converter markets.  Rather, Nett and Airflow have strategically chosen to present *no allegations whatsoever* regarding their business operations.  But publicly available information on the Plaintiffs' respective websites fills these gaps and demonstrates that Plaintiffs' omission was by design, intended to obscure the fact that they have no connection whatsoever to the automotive industry.

Airflow is a manufacturer of industrial equipment that provides "a targeted [product] portfolio of diesel oxidation catalysts and diesel particulate filters" for the underground mining and marine industries.  RJN Exs. 1–3.[1]  Nett is an industrial manufacturer that sells emissions control products in the construction, mining, material handling, power generation, utility, marine, locomotive, and gantry crane markets.  RJN Ex. 5.  Airflow and Nett are industrial machinery manufacturers, and they allege nothing to show that the industrial market is intertwined with the automotive market for OEMs that is the subject of the alleged conspiracy.

Moreover, Nett is alleged to be a foreign corporation formed under the laws of the province of Ontario, Canada, with its principal place of business in Canada.  *See* Compl. ¶ 20.  Nett does not allege that it has any operations in the United States and, in fact, any alleged purchases by Nett of Ceramic Substrates from Defendants occurred outside the United States.

Plaintiffs additionally allege that Defendants fraudulently concealed their conspiracy such that Plaintiffs were unable to learn of their potential claims until the first of Defendants' plea

---

[1] Defendants have also submitted to the Court herewith a Request for Judicial Notice ("RJN") of certain publicly available facts and information.

agreements with the Department of Justice was made public on September 3, 2015, "when investigations into price fixing in the Ceramic Substrates industry by antitrust regulators first became public."  Compl. ¶¶ 90–99.  Plaintiffs make this claim despite the fact that Defendant Corning Incorporated publicly disclosed the DOJ's investigation into anticompetitive conduct in the Ceramic Substrates market through an SEC filing on March 30, 2012.  RJN Ex. 6 at 3.  Press coverage of this initial disclosure was significant, *see* RJN Exs. 26–30, and Corning Incorporated issued additional publications of the disclosure, updated as necessary, on a quarterly basis through April 2016.  *See* RJN Exs. 6, 8–25.

## <u>LEGAL STANDARDS</u>

<u>Subject-Matter Jurisdiction</u>.  A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) where a plaintiff has failed to meet its burden to prove that the court has subject-matter jurisdiction to hear its case.  Fed. R. Civ. P. 12(b)(1); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).  A Rule 12(b)(1) motion may challenge the sufficiency of the plaintiff's subject-matter allegations on the face of the complaint, or it may bring a substantive challenge to the underlying factual basis for a claim of subject-matter jurisdiction.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  On a facial attack, as on a 12(b)(6) motion, "all allegations of the plaintiff must be considered as true," but when the factual basis for jurisdiction is challenged, "the trial court must weigh the evidence[.]"  *Murry v. Mich. Dep't of Corr.*, No. 07-14126, 2008 WL 126157, at *1 (E.D. Mich. Jan. 11, 2008) (Battani, J.) (dismissing claims for lack of standing) (quoting *DLX,* 381 F.3d at 516).  "A substantive attack . . . goes beyond the complaint and challenges the facts upon which subject matter jurisdiction depends.  '[N]o presumptive truthfulness applies to the factual allegations, [and] a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts.'"  *Ray v. PPOM, L.L.C.*, No. 04-60287, 2005 WL 1984470, at *1(E.D. Mich. Aug. 9, 2005)

(Battani, J.) (granting motion to dismiss for lack of standing) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 992 F.2d 320, 325 (6th Cir. 1990)).  Article III standing is an element of subject-matter jurisdiction which must be established by Plaintiffs as a matter of fact in response to a motion under Rule 12(b)(1).  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III"); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("[A]t the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element.") (alteration in original).

Failure to State a Claim.  Federal Rule of Civil Procedure 8(a)(2) requires that a pleading set forth a "short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" is insufficient under the Rule 8 pleading standard.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original).  An insufficient complaint is subject to dismissal pursuant to Rule 12(b)(6) when it fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "[I]t is not enough merely to plead a set of facts 'consistent with' a claim to relief; there must also be enough 'factual enhancement' to 'nudge [the] claim[ ] across the line from conceivable to plausible.'"  *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 444 (6th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007)); *see also In re Bearings*, 50 F. Supp. 3d 836, 847 (E.D. Mich. 2014) (Battani, J.) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.") (citing *Twombly*, 550 U.S. at 555).  Antitrust standing is an essential element of an antitrust claim subject to a pleading challenge under Rule 12(b)(6).  *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc) ("[A]ntitrust standing is a

threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law[.]").

Judicial Notice. On a motion to dismiss, the Court is entitled to consider facts "not subject to reasonable dispute" if they "can be readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2); *Pearce v. Faurecia Exhaust Sys., Inc.*, 529 F. App'x 454, 459 (6th Cir. 2013) (examples of sources "typically used for judicial notice" include "a dictionary, public record, or even a newspaper article"). The Court may take judicial notice at any stage of a proceeding, and the Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." FED. R. EVID. 201(c)(2), (d); *see also In re Ceramic Substrates*, Nos. 2:16-cv-3802, -3803, 2017 WL 7689654, at *1 (E.D. Mich. May 5, 2017) (Battani, J.) (granting request for judicial notice).

Within the Sixth Circuit, "[i]n ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency." *Webasto Thermo & Comfort N. Am., Inc. v. Bestop, Inc.*, No. 16-CV-13456, 2017 WL 4535290, at *3 (E.D. Mich. Oct. 11, 2017); *see also Thomas v. Noder-Love*, 621 F. App'x. 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (internal quotation marks and citation omitted). Other matters of public record of which the court can take judicial notice on a motion to dismiss include (a) SEC filings, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); (b) court proceedings, *Bedford v. Michigan*, 722 F. App'x 515, 517 n.1

(6th Cir. 2018); and (c) newspaper articles, *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 973 (W.D. Mich. 2003).  Courts may also take judicial notice of matters of common knowledge, *Pearce*, 529 F. App'x at 459, including websites.  *E.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005) (taking judicial notice of private website in evaluating appeal of motion to dismiss ruling); *see also Energy Automation Sys., Inc. v. Saxton*, 618 F. Supp. 2d 807, 810 (M.D. Tenn. 2009) (a court may take judicial notice of the contents of an Internet website); *NAACP v. Snyder*, 879 F. Supp. 2d 662, 666 n.5 (E.D. Mich. 2012) (taking judicial notice of non-governmental websites in considering motion to dismiss). Further, courts may take judicial notice of a party's own public statements, *see United States v. Bd. of Cty. Comm'rs of Hamilton Cty., Ohio*, No. 1:02-CV-00107, 2010 WL 200326, at *5 (S.D. Ohio Jan. 14, 2010), and party admissions on a website, *see Arellano v. Continuing Care Risk Retention Group Inc.*, No. CV 11-01058 MMM (PJWx), 2011 WL 13217934, at *2 n.17 (C.D. Cal. June 9, 2011).  The Court may consider such sources without converting the motion to dismiss into one for summary judgment.  *Thomas,* 621 F. App'x at 829.

## ARGUMENT

## I.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED BECAUSE THEY CANNOT ESTABLISH EITHER ARTICLE III OR ANTITRUST STANDING.

An antitrust plaintiff must establish the threshold requirements that it has both Article III standing and antitrust standing to pursue its claims.  In so doing, "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury-in-fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("*AGC*"); *see also In re Wire Harness*, No. 2:12-cv-00102, -00103, 2013 WL 2456612, at *13 (E.D. Mich. June 6, 2013) (Battani, J.).  Here, Plaintiffs have failed to establish

8

either type of standing because they did not purchase Ceramic Substrates, *i.e.*, ceramic substrates for an automotive use and their injury claims are too remote.[2]

A.   **Plaintiffs Cannot Establish Article III Standing Because They Are Manufacturers Of Industrial Products That Did Not Purchase Ceramic Substrates For Automotive Applications And Therefore Suffered No Injury From The Alleged Conspiracy**

To establish Article III standing, Plaintiffs must show they "(1) suffered injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547; *see also Duncan v. Muzyn*, 885 F.3d 422, 427 (6th Cir. 2018).  But Plaintiffs cannot satisfy even the "first and foremost" of the Article III requirements: injury in fact.  *Spokeo*, 136 S. Ct. at 1547.  The Supreme Court's recent guidance in *Spokeo* emphasizes that a plaintiff's claim of injury must be carefully examined to ensure that the claimed injury is both "particular," in that the injury affects the plaintiff in a personal and individual way, and "concrete," in that it is "real, not abstract."  *See id.* at 1547–50 (remanding to Ninth Circuit because "its standing analysis was incomplete" until it had "fully appreciate[d] the distinction between concreteness and particularization").  Plaintiffs neither plead a particular and concrete injury-in-fact, nor any facts that allow even the slightest inference that their alleged injuries are somehow traceable to the conduct of the Defendants.

Defendants accordingly assert both a facial and factual challenge to the subject-matter jurisdiction of this Court in light of Plaintiffs' inability to establish Article III standing to bring claims based on the conspiracy alleged in the Complaint.  As both the facts as pled and the

---

[2] Furthermore, Nett has failed to meet its burden to plead, as a foreign plaintiff making foreign purchases, that any of its alleged purchases are within the scope of the U.S. antitrust laws notwithstanding the FTAIA.  As Nett has not alleged any facts to support that it made any purchases from Defendants which survive the restrictions of the FTAIA, Nett has failed to plead a basis upon which it could have suffered a cognizable injury and lacks Article III standing for this reason as well.

underlying factual basis for jurisdiction are challenged here, the Court should consider both the allegations in the Complaint and the factual materials submitted with this motion to determine whether dismissal is required because the Court lacks subject-matter jurisdiction to hear Plaintiffs' claims. *See Murry*, 2008 WL 126157, at *1; *Ray*, 2005 WL 1984470, at *1(Battani, J.) (on a substantive attack, "a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts").

Plaintiffs cannot establish Article III standing here because they did not purchase, and thus did not suffer any injury from, the Ceramic Substrates that are the subject of the conspiracy alleged in their Complaint. Ceramic Substrates, as alleged by Plaintiffs, are products used in automobiles:

> "Ceramic Substrates" refers to uncoated ceramic monoliths with a fine honeycomb structure that—after being coated with a mix of metal and chemicals— are used in ***automotive catalytic converters*** as emission control devices in exhaust-gas purification systems.

Compl. ¶ 3 (emphasis added); *see also id*. ¶ 35. Plaintiffs further allege that these Ceramic Substrates were the subject of a price-fixing conspiracy targeting ***automobile*** OEMs. *See, e.g.*, *id*. ¶ 5 ("Defendants' cartel effectively fixed, maintained, or stabilized prices of Ceramic Substrates . . . ***submitted to automobile manufacturers*** in the United States and elsewhere."), ¶ 64 ("Defendants and their co-conspirators discussed bids and price quotations for Ceramic Substrates to be ***submitted to automobile manufacturers*** in the United States and elsewhere."), ¶ 65 ("Defendants and their co-conspirators reached an agreement to restrict competition for bids and price quotations for Ceramic Substrates ***submitted to automobile manufacturers*** and agreed to rig bids and allocate the supply of Ceramic Substrates sold in the United States and elsewhere.") (emphases added).

Plaintiffs do not allege that they participate in the automobile market or in any market inextricably linked to the automobile market. *See generally* Compl. A review of the actual

jurisdictional facts demonstrates that Plaintiffs cannot truthfully allege participation in the automobile market. Indeed, Airflow does not purchase or sell ceramic substrate products for automotive uses, let alone for use by the automotive OEMs. Instead, it makes and sells industrial—not automotive—emissions control equipment. RJN Exs. 1–3. As a result, Airflow has not and cannot plausibly dispute that any ceramic substrates it may have purchased from Defendants would have been purchased for use in an industrial (*i.e.*, non-automotive) application, and therefore would not be "Ceramic Substrates" as defined in their Complaint. Likewise, Nett is an industrial seller of emissions control products and does not compete in the market for automotive products. RJN Ex. 5, Nett Industries page.[3] As no industrial market conspiracy is alleged, these facts are fatal to Plaintiffs' Article III standing.

Although Plaintiffs allege that they suffered injury in the form of "pa[ying] supracompetitive prices for Ceramic Substrates" as a "result of Defendants' conspiracy," Compl. ¶¶ 100-02, it is axiomatic that Plaintiffs could not have suffered such an Article III injury unless they actually purchased Ceramic Substrates that were the subject of such a conspiracy. *Lujan*, 504 U.S. at 560; *In re Flash Memory Antitrust Litig.*, No. C 07–0086 SBA, 2010 WL 2465329, at *6 (N.D. Cal. June 10, 2010) (ordering sole named plaintiff to show cause why case should not be dismissed after learning plaintiff had not purchased allegedly price-fixed product); *cf. In re Lehman Bros. Secs & ERISA Litig.*, 684 F. Supp. 2d 485, 490 (E.D.N.Y 2010) ("As no named plaintiff has alleged that he or she purchased Certificates in any of the other eighty-five offerings, none can have been injured with respect to those offerings. None, therefore, has standing to bring

---

[3] RJN Ex. 5, NETT TECHNOLOGIES INC. INDUSTRY PAGE, https://www.nettinc.com/industries (last visited July 6, 2018) (listing Nett Technologies Inc.'s industries as construction, mining, material handling, power generation, utility, marine, locomotive, and gantry cranes).

claims with respect to these offerings."). This Court has previously found dismissal appropriate where plaintiffs asserted claims to recover for alleged harm arising from the sale of a product they had not purchased. *See Wire Harness*, 2015 WL 10372435, at *3 (dismissing Truck and Equipment Dealer Plaintiff claims against defendants that "did not manufacture or sell wire harnesses to be installed in Trucks and Equipment").

Here, Plaintiffs have not, and cannot, plausibly allege that any ceramic substrates they may have purchased from Defendants were "Ceramic Substrates" as defined in the Complaint. Plaintiffs cannot state that they purchased any Ceramic Substrates for use in automotive products, let alone in products related to those sold to automotive OEMs, as they do not compete or participate in the automotive market. Instead, they are sellers of industrial emissions control systems incorporating ceramic substrates for industrial (not automotive) uses that are not alleged to be the subject of the conspiracy claimed in the Complaint. These facts make it impossible for Plaintiffs to cure their pleading defects and impossible for them to show that there is Article III standing and subject-matter jurisdiction over their claims.

### B.  Plaintiffs Are Also Too Remote To Have Any Antitrust Injury Or Standing

Separate from and in addition to the requirement that Plaintiffs establish Article III standing, Plaintiffs must also show antitrust standing. The test for antitrust standing is even stricter than the test for Article III standing and has been set forth by the Supreme Court in *AGC*. 459 U.S. at 539–45; *id.* at 535 n.31 (noting that even if a court were to find injury-in-fact, the "court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action"); *see also Wire Harness*, 2013 WL 2456612, at *13. Courts in this Circuit apply the factors laid out by the Supreme Court in *AGC* to assess whether a plaintiff can plausibly trace its claims directly to the alleged antitrust violation—that is, to ensure, among other things, that the plaintiff is not overly remote and is instead a proper party to bring the action. *Southaven Land Co., Inc. v.*

*Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983) (adopting *AGC* factors); *see also Wire Harness*, 2013 WL 2456612, at *13 ("courts are required to determine whether a particular plaintiff is a proper party to bring a private antitrust action").

The *AGC* factors which the Court must consider to determine whether Plaintiffs have properly pled antitrust standing are:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused;
>
> (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;
>
> (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;
>
> (4) the potential for duplicative recovery or complex apportionment of damages; and
>
> (5) the existence of more direct victims of the alleged antitrust violation.

*Southaven*, 715 F.2d at 1086-87. In the Sixth Circuit, "[a]ll five factors must be balanced . . . with no one factor being determinative." *Caruana v. Gen. Motors Corp.*, 204 F. App'x 511, 515 (6th Cir. 2006). In making this assessment, courts should generally "giv[e] great weight to the nature of the plaintiff's alleged injury." *Wire Harness*, 2013 WL 2456612, at *14 (citing *AGC*). Considering all of these factors, both separately and together, this Court should conclude that Plaintiffs have filed a Complaint "that by its terms fails to establish" that Plaintiffs have antitrust standing to bring their claims against Defendants. *See Static Control Components, Inc. v. Lexmark Int'l, Inc.,* 697 F.3d 387, 402 (6th Cir. 2012), *aff'd*, 134 S. Ct. 1377 (2014).

### 1. Plaintiffs Have Not Pled An Adequate Causal Connection Between The Alleged Conspiracy In The Relevant Market And Their Alleged Harm Outside Of That Market

Plaintiffs cannot satisfy the requisite causal connection under *AGC* because they are not participants in the market that was the subject of the alleged conspiracy and thus there is no causal

connection between the alleged antitrust violation and their alleged harm.  The Complaint is

express in pinpointing the OEM automotive vehicle market as the target of the alleged conspiracy,

beginning—most tellingly—with the very definition of the product at issue and identification of

the alleged intended victims of the conspiracy:

> "Ceramic Substrates" refers to uncoated ceramic monoliths with a fine
> honeycomb structure that—after being coated with a mix of metal and
> chemicals— are used in ***automotive catalytic converters*** as emission control
> devices in exhaust-gas purification systems.  Catalytic converters purify
> exhaust gas by converting pollutants in the exhaust-gas stream into less harmful
> gases through catalytic chemical reactions. . . . Defendants' cartel effectively
> fixed, maintained, or stabilized prices of Ceramic Substrates by rigging bids,
> price quotations, and price adjustments submitted to ***automobile
> manufacturers*** in the United States and elsewhere.

Compl. ¶ 3 (emphases added); *see also, e.g.*, *id.* ¶¶ 5, 35, 64, 65.  Plaintiffs allege no facts to

support any plausible assertion that they participated in the automotive market.

To the contrary, even a brief review of each Plaintiff's publicly available marketing

materials reveals that the markets in which they *actually* participate are all industrial, not

automotive, such that Plaintiffs simply cannot file a truthful pleading to overcome this fatal defect

in their antitrust standing.  For instance, on its website, Plaintiff Airflow states that it offers

"[E]MISSIONS CONTROL SOLUTIONS FOR ***UNDERGROUND MINING AND MARINE***

***APPLICATIONS***."  RJN Ex. 1.[4]  Airflow identifies the markets in which it participates, none of

which are relevant to this litigation:  "***Our Target Market*** is diesel emissions control in mining

and marine applications."[5]  According to their Equipment Applications page, Airflow works on

---

[4] RJN Ex. 1, AIRFLOW CATALYST SYSTEMS HOME PAGE, http://airflowcatalyst.com (last visited
June 27, 2018) (emphasis added).

[5] RJN Ex. 2, AIRFLOW CATALYST SYSTEMS COMPANY PAGE,
http://www.airflowcatalyst.com/new/company/#toggle-id-4 (last visited June 27, 2018)
(emphasis added).

the following products: Drill rigs; Man trips; Personnel carriers; Powder trucks; Rail cars / trams; Roof bolters; Roof Scalers; Scoops; Stationary generators; Tow Tractors; Coastal Ship Engines; and Luxury Yacht Diesel Engines.[6]  Similarly, Nett's home page reveals that it provides emissions control solutions in the construction, mining, material handling, power generation, utility, marine, locomotive, and gantry crane markets.[7]  None of these applications or industries place Plaintiffs in the market for the ceramic substrates for *automotive* applications that Plaintiffs have put at issue in this case.  The alleged rigging of bids to Ford, Toyota, GM, and other automobile manufacturers, *see* Compl. ¶ 39, has nothing to do with these Plaintiffs.  There is no basis upon which Plaintiffs can overcome this fatal antitrust standing defect.

Plaintiffs' allegations of a conspiracy directed only at automotive substrates, the automotive market, and automotive OEMs disprove their claims to be proper plaintiffs here. Indeed, Plaintiffs' Complaint is devoted exclusively to discussing facets of the automotive market and the harm Defendants allegedly intended to inflict upon that market.  *See, e.g.*, *id.* ¶ 88 (discussing "the government's investigation into 'almost every market where ***automobiles*** are manufactured and/or sold'") (emphasis added).  Tellingly, despite delivering a virtual treatise on the automobile OEM Ceramic Substrate RFQ process, *see id.*¶¶ 39–47, Plaintiffs are mute when it comes to any discussion of how ceramic substrate prices are negotiated and set in the industrial markets the Plaintiffs occupy.  The reason for this intentional omission is clear:  Plaintiffs simply

---

[6] *See* RJN Ex. 3, AIRFLOW EQUIPMENT APPLICATIONS PAGE,
http://www.airflowcatalyst.com/new/equipment-applications/ (last visited June 27, 2018).

[7] RJN Ex. 4, NETT TECHNOLOGIES INC. HOME PAGE, https://www.nettinc.com/ (last visited June 27, 2018).

cannot show a causal connection between the alleged conspiracy in the relevant market and their alleged harm outside that market.[8]

Plaintiffs' attempt to claim antitrust injury for purchases of industrial products based on claims of a conspiracy in the automotive market stands in stark contrast to those industrial purchaser claims this Court found satisfied antitrust injury in *Bearings*. *See In re Bearings*, No. 2:12-cv-00501, 2014 WL 4272772, at *7–11 (E.D. Mich. Aug. 29, 2014). The direct purchaser plaintiffs in *Bearings* who purchased industrial bearings, alleged a conspiracy in both the industrial and automotive bearings markets. *Id.* Here, in contrast, Plaintiffs make no allegations whatsoever about any conspiracy in the industrial market for ceramic substrates, nor could they. The only facts concerning anticompetitive conduct alleged in the Complaint all exclusively concern the automotive market. *See, e.g.*, Compl. ¶¶ 3, 5, 35, 39–47. As the Sixth Circuit concluded in *Static Control*, any injury plaintiffs allegedly suffered must be connected to the market about which the *facts* of the conspiracy are pled, notwithstanding other markets to which plaintiffs would like to connect their claims. *Static Control*, 697 F.3d at 402-03 ("[A]lthough we read the allegations . . .

---

[8] The Court should not be misled by Plaintiffs' use of the term "motor vehicles" in the Complaint. *See, e.g.*, Compl. ¶¶ 2, 40, 42, 43, 45. To mask the fact that they are not participants in the market for Ceramic Substrates, as defined in their Complaint, *see id.* ¶ 3, Plaintiffs conflate their heavy-duty industrial, mining, and marine equipment and the automotive passenger vehicle market by applying "motor vehicles" to an overly broad range of products. Plaintiffs' efforts fail, however, because the term "motor vehicle" is expressly defined by statute to mean "every description of carriage or other contrivance propelled or drawn by mechanical power and used for commercial purposes **on the highways** *in the transportation of passengers, passengers and property, or property or cargo*." 18 U.S.C. § 31(a)(6) (2018) (emphases added). Plaintiffs have not alleged that the heavy-duty industrial, mining, and marine equipment of their product markets transport passengers, property, or cargo "on the highways," in accordance with the statute; nor can they in light of the clear evidence of their participation in the industrial market, of which this Court should take judicial notice. *See* RJN Exs. 1-5. Even these conflated allegations identify the automotive passenger vehicle market as the sole market subject to Plaintiffs' alleged conspiracy. *Accord* Compl. ¶¶ 3, 5, 35, 65.

in the light most favorable to [plaintiff], we must carefully consider the actual factual allegations underlying such conclusory allegations.").

In *Static Control*, the Sixth Circuit affirmed the dismissal of claims brought by Static Control, a supplier of toner cartridge parts, finding that Static Control lacked antitrust standing because it failed to sufficiently identify any role it played in the "remanufactured" cartridges market allegedly affected by the alleged anticompetitive conduct, as opposed to the microchip and component parts markets in which it actually participated.  *See id.* at 403 ("[A]lthough Static Control's allegations often refer to the 'relevant markets,' the specific factual allegations explain only [anticompetitive] impact on the market for remanufactured cartridges.").  Similarly, because Plaintiffs here did not participate in the automotive OEM market, there is no causal connection between the alleged antitrust violation and their alleged harm.[9]

### 2. Plaintiffs Have Not Pled That They Suffered Any Injury In An Inextricably Linked And Intertwined Market

As shown above, Plaintiffs clearly have alleged nothing to show that they are participants in the relevant automotive market.  They are part of the separate industrial market, which comprises emissions control products for industrial-scale equipment and industrial applications.  RJN Exs. 1–5.  But as this Court has previously noted, "some courts have rejected a strict 'market-participant' test" in conducting the *AGC* analysis, *Wire Harness*, 2013 WL 2456612, at *15,

---

[9] In the same vein, Plaintiffs' alleged injury cannot be said to have been "intended" by the purported conspiracy; nor do they allege that it was.  *See Southaven*, 715 F.2d at 1085.  Instead, Plaintiffs' allegations state plainly that the harm intended by the alleged conspiracy was directed at the automotive OEMs.  *See, e.g.*, Compl. ¶¶ 5, 64–65 (alleging the purpose of the alleged conspiracy was "to restrict competition for bids and price quotations for Ceramic Substrates submitted **to automobile manufacturers**") (emphasis added).  Here, as in *Static Control*, Plaintiffs "fail[] to allege plausibly that the [anticompetitive conduct] was intended to harm [them]."  *Static Control*, 697 F.3d at 404 (identifying intended targets elsewhere and concluding plaintiff lacked antitrust standing).  Plaintiffs, too, thus fail to satisfy the last inquiry of the causal connection inquiry.

instead allowing claims to proceed where asserted by a plaintiff from a market demonstrated to be "inextricably linked and intertwined" with the relevant market. *Id*. (citing *Province v. Cleveland Press Pub. Co.,* 787 F.2d 1047, 1052 (6th Cir. 1986)); *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483–84 (1982). In *Wire Harness*, this Court accepted indirect purchaser plaintiffs' ("IPPs") allegations that the market for Automotive Wire Harness Systems existed to serve the vehicle market in which IPPs participated. *Wire Harness*, 2013 WL 2456612, at *15–16 (finding sufficient on a motion to dismiss IPPs' allegation that "[w]ithout the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility. Indeed, the demand for vehicles creates the demand for Automotive Wire Harness Systems"). Here, however, there are no allegations in the Complaint to support any claim that the markets for industrial substrates applications and automotive substrates applications are inextricably linked and intertwined—nor could there be.

"An inextricably intertwined injury is one that results from the manipulation of the injured party as a means to carry out the restraint of trade in the product market." *Static Control*, 697 F.3d at 405. In *McCready*, the Supreme Court held that a plaintiff who was not a direct participant in the relevant market nonetheless had antitrust standing to sue defendants because harming plaintiff had been "a necessary step in effecting the ends of the alleged illegal conspiracy." 457 U.S. at 479. Accordingly, to succeed on an "intertwined" market argument, Plaintiffs would have to show that Defendants "manipulated or utilized [them] as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets." *Static Control*, 697 F.3d at 404.

A review of the Complaint in this case, however, demonstrates that there is no plausible argument that any harm Plaintiffs may have suffered as a result of any alleged minimal purchases

of ceramics substrates for use in mining, marine, and industrial markets was necessary to the execution of the alleged conspiracy in the entirely separate market for automotive OEMs.  Indeed, Plaintiffs have made no such "inextricably intertwined" allegation in the Complaint or pled themselves to be an indispensable component to the successful operation of the alleged conspiracy.  Further, it is evident from the face of Plaintiffs' Complaint that the conspiracy alleged would proceed accordingly so long as *the automotive OEMs* were purchasing Ceramic Substrates for use in their automotive passenger vehicles; any purchases by Plaintiffs of ceramic substrates for unrelated industrial products would be irrelevant to those transactions.  *Compare* Compl. ¶¶ 39–89, 94 *with McCready*, 457 U.S. at 479 (interpreting "inextricably intertwined" to mean plaintiff's injury was "so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations would be likely to cause") (internal quotation marks and citation omitted).

Likewise, the utility of Ceramic Substrates for passenger automobiles exists independently of the industrial equipment in Plaintiffs' market.  *Cf. Wire Harness*, 2013 WL 2456612, at *15.  Indeed, the very *purpose* of the Ceramic Substrates which were the subject of the alleged conspiracy, as defined *by Plaintiffs* in their Complaint, was to serve the market for *automotive* vehicles.  Compl. ¶ 3.  Plaintiffs, as manufacturers of industrial products, simply cannot connect themselves to the relevant market for automotive OEM applications.[10]  Thus, while *Wire Harness*

---

[10] As Plaintiffs allege, Ceramic Substrates are made-to-order, custom automotive parts that function as "exhaust gas purification systems" for automotive vehicles.  Compl. ¶¶ 35, 41–42 (alleging that "RFQs [for Ceramic Substrates] generally include specifications . . . and are issued to automotive suppliers on a model-by-model basis for model-specific parts").  Plaintiffs participate only in the industrial equipment market, which consists of large, heavy-duty mining, marine, and locomotive equipment operated by diesel fuel instead of gasoline.  RJN Exs. 1–5.  Plaintiffs have not plausibly alleged facts to support a connection between the large scale, heavy-

IPPs alleged, and the Court accepted, that the market for the allegedly price-fixed product was completely dependent on the product market occupied by IPPs, 2013 WL 2456612, at *16, here the inverse is true:  there is no allegation connecting the allegedly price-fixed Ceramic Substrates sold to automotive OEMs in any way to of Plaintiffs' industrial equipment market.

### 3.  Plaintiffs Have Not Pled That They Suffered Any Injury That Meets The "Directness" Requirement For Antitrust Standing

Plaintiffs similarly come up short in adequately pleading directness of their alleged injury. The Sixth Circuit has recently held that even where a plaintiff can "establish that it was negatively affected" by alleged anticompetitive conduct, or where "incidental effects in . . . other markets" have been properly alleged, the plaintiff's injury in a separate but related market is "too attenuated to qualify" as antitrust injury, and is instead merely "a side effect of [Defendants'] alleged antitrust violations."  *Static Control*, 697 F.3d at 403-405.

When viewed in its best possible light, Plaintiffs' Complaint cannot meet this standard, as they have not alleged facts that show how the industrial market in which they participated was related at all to the market for Ceramic Substrates, or how the alleged antitrust violation in the automotive market could have had even an incidental effect on them.  Plaintiffs allege that the winning bid on an automotive OEM's RFQ for Ceramic Substrates serves as a "price floor" when other purchasers subsequently negotiate prices for Ceramic Substrates, and that "[e]very subsequent purchaser . . . pays at least the winning price set by the RFQ or higher."  Compl. ¶¶ 44–45.  Because of this setup, Plaintiffs claim that, as a result of the alleged "rigged bids," "OEMs and all or nearly all other direct purchasers of Ceramic Substrates paid supra-competitive prices for those products."  *Id*. ¶¶ 70–72.  But the fatal problem with these claims is that Plaintiffs do not

---

duty emissions control products required by this large-scale, heavy-duty industrial equipment and any part of the automotive market.

plausibly allege that they are subsequent purchasers of Ceramic Substrates for automotive product uses.  Nor do they allege any facts from which it could be inferred that an automotive OEM's price for Ceramic Substrates would impact purchasers in the industrial market.  In fact, Plaintiffs allege nothing at all to place them within the scope of any of the events they have alleged.  As a result, even accepting these claims as true, they still do not allege any "direct" injury suffered *by Plaintiffs*, as there is no way for Plaintiffs to draw a continuous or unbroken chain of causation from the sale of mass quantities of Ceramic Substrates to automotive OEMs for use in passenger automobiles to their own alleged purchases of other types of ceramic substrates for use in industrial products that have no relationship to automobiles.[11]  Plaintiffs' indirect injury claims for industrial products renders Plaintiffs precisely the type of "persons [who] have sustained injuries *too remote* from an antitrust violation to give them standing to sue for damages under § 4."  *McCready*, 457 U.S. at 476 (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 728 (1977)).

Additionally, this Court has recognized that courts have previously held that the "directness requirement [is] not met where the 'complaint sets forth no allegations that, within the final

---

[11] According to NGK's Plea Agreement with the U.S. Department of Justice, Ceramic Substrates are incorporated into catalytic converters and "[a] typical internal combustion engine automobile has one or two catalytic converters".  RJN Ex. 32, Plea Agreement, *United States v. NGK Insulators, Ltd.*, No. 15-cr-20550 (E.D. Mich. Nov. 16, 2015) ECF No. 10 at 3.  NGK's Plea Agreement identified General Motors and Toyota as automobile OEMs whose purchases of Ceramic Substrates were affected by the alleged conduct between 2000 and 2010, and between 2008 and 2010 for Nissan.  RJN Ex. 32, NGK Plea Agreement at 3–4.  As an example of the large volume of Ceramic Substrates needed by automobile OEMs, GM sold approximately 18,523,000 automobiles in the United States during those years (*see* General Motors Co. 2001 *Form 10-K* (available at SEC EDGAR website); General Motors Co. 2004 *Form 10-K* (available at SEC EDGAR website); General Motors Co. 2007 *Form 10-K* (available at SEC EDGAR website); General Motors Co. 2010 *Form 10-K* (available at SEC EDGAR website); General Motors Co. 2011 *Form 10-K* (available at SEC EDGAR website)).  Accordingly, during the ten year period, GM alone needed no fewer than 18.5 million Ceramic Substrates just for its automobiles sold in the United States.

purchase price of a given product purchased by plaintiffs . . . the [overcharge] is somehow directly traceable or distinguishable.'" *Wire Harness*, 2013 WL 2456612, at *17 (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007)). Here, there are no allegations to support a claim that any portion of the price of ceramic substrates allegedly purchased by industrial customers like Plaintiffs is "traceable" in any way to any overcharge in the price at which automotive OEMs bought Ceramic Substrates pursuant to allegedly price-fixed RFQs.

### 4. The Speculative Nature of Plaintiffs' Damages (If Any) Further Weighs Against Finding Antitrust Standing

The Sixth Circuit has warned that situations like this one, with at most indirect and remote injuries "may render damages highly speculative or create situations of complexity that would foreclose an equitable determination and apportionment of damages." *Southaven*, 715 F.2d at 1087.

Plaintiffs' attempt to link, in highly conclusory fashion, price-fixing on certain RFQs for Ceramic Substrates to the prices paid by other purchasers in other markets is, on its face, speculative and impracticable. Plaintiffs offer no factual support for the allegation that the winning bid from an automotive OEM on one RFQ would set the price floor for any other purchaser of that particular Ceramic Substrate. *See* Compl. ¶¶ 44–45. Nor do Plaintiffs even *allege* how the price charged to automotive OEMs as a purported "floor" would enable them to "show what portion of the [part] price resulted from the conspiracy, and the extent to which the overcharge amount affected the [final] price paid[.]" *Wire Harness*, 2013 WL 2456612, at *18. And they have alleged literally nothing to show how this complex pricing theory would then affect prices in the entirely separate *industrial* market.

### 5.   Automotive Purchasers Of Ceramic Substrates Would Be More Efficient Enforcers Of The Antitrust Laws

Finally, Plaintiffs are demonstrably less efficient enforcers than any automotive purchaser of Ceramic Substrates.  "Where there are more-direct victims of the anticompetitive conduct, those victims have the standing to sue, rather than those affected indirectly."  *Static Control*, 697 F.3d at 406 (citing *Southaven*, 715 F.2d at 1087).  This is because more-direct victims constitute "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement[,] diminish[ing] the justification for allowing a more remote party" to do so.  *AGC*, 459 U.S. at 542.  Consequently, the Sixth Circuit has consistently held that "[m]ore direct victims may justify denial of a § 4 remedy to those only tangentially injured since such [denial] is not likely to leave a significant antitrust violation undetected or un-remedied."  *Southaven*, 715 F.2d at 1087 (internal quotation marks and citation omitted); *accord Bearings*, 50 F. Supp. 3d at 854 (quoting *McCready*, 457 U.S. at 465) ("It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.").

As discussed, Plaintiffs' Complaint is replete with allegations about the automotive OEMs' central role as the targets and direct victims of the alleged conspiracy.  *E.g.*, Compl. ¶¶ 62–67, 70–72, 94, 100–102; *see also supra* pp. 2–4.  Plaintiffs therefore are not even *alleged* to be the most direct victims of the alleged conspiracy according to their own claims.  The more-direct victim factor of the *AGC* analysis thus provides additional support for the conclusion that Plaintiffs cannot plead antitrust standing here.

### C.   Plaintiffs Also Do Not Have Standing To Seek Injunctive Relief

Finally, while the Clayton Act enables a private party to seek, in addition to damages, injunctive relief "against threatened loss or damage by a violation of the antitrust laws," 15 U.S.C.

§ 26, the Plaintiffs must have standing to obtain this relief as well.  The Clayton Act does not

"authorize a private plaintiff to secure an injunction against a threatened injury for which he would

not be entitled to compensation if the injury actually occurred."  *Cargill, Inc. v. Monfort of Colo.,*

*Inc.*, 479 U.S. 104, 112 (1986).  Because Plaintiffs have failed to plead facts sufficient to establish

antitrust injury here, they do not have standing to pursue their request for equitable relief against

conduct which does not threaten them with the "type of injury the antitrust laws were intended to

prevent."  *See Valley Prods. Co. v. Landmark*, 128 F.3d 398, 402 (6th Cir. 1997) (internal citation

omitted) ("Without antitrust injury, no private antitrust action will lie at law or in equity.").

## II.    THE FTAIA BARS NETT'S CLAIMS

The FTAIA establishes that the Sherman Act does not apply to conduct involving foreign

trade or commerce unless such conduct (i) relates to import commerce (commonly referred to as

the "import exception") or (ii) the conduct has a direct, substantial, and reasonably foreseeable

effect on U.S. import, export, or domestic commerce, and such domestic effect gives rise to a

federal antitrust claim (commonly referred to as the "domestic effects exception").  15 U.S.C. §

6a.  The FTAIA "was intended to exempt from the Sherman Act export transactions that did not

injure the United States economy. . . . This technical language initially lays down a general rule

placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach."

*Bearings*, 2014 WL 4209588, at *6 (internal citations and quotation marks omitted) (emphasis in

original); *see also Am. Pan Co. v. Lockwood Mfg., Inc.*, No. C-3-06-197, 2008 WL 471685, at *11

(S.D. Ohio Feb. 15, 2008) (citing *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267,

1269 (D.C. Cir. 2005) ("*Empagran II*") for the proposition that the FTAIA "excludes

anticompetitive conduct that causes only foreign injury from the reach of the Sherman Antitrust Act").[12]

Nett, a foreign company with no alleged ties to the United States, has made no allegation regarding the location of Nett's purchases, nor the defendant(s) or country or countries from which Nett made such purchases. Taking the allegations contained in the Complaint as true, Nett, a company headquartered and incorporated in Canada, suffered an injury in Canada as a result of its alleged purchase of Ceramic Substrates from an unspecified country (or countries). There are no grounds to read into the Complaint that Nett made any such purchases from the United States, and its claim therefore does not arise under U.S. antitrust laws as it is based entirely on foreign sales. *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2016 WL 6138600, at *8 (E.D. Mich. Oct. 21, 2016) (dismissing antitrust claim as barred by the FTAIA where foreign subsidiary of U.S. company purchased allegedly price-fixed product in foreign commerce).

As a foreign company with foreign purchases, Nett must therefore demonstrate that an exception to the FTAIA applies as a necessary element of its Sherman Act claim. *See Bearings*, 2014 WL 4209588, at *6 (reiterating that the FTAIA "imposes a substantive requirement setting forth an element of an antitrust claim") (citation and internal quotation marks omitted). This would be required even if Nett were found to have alleged a purchase from a United States defendant, as the FTAIA exempts export transactions by default from the Sherman Act. *See id.* ("Enacted in 1982, the FTAIA was intended to exempt from the Sherman Act export transactions that did not

---

[12] "Export commerce" is "generally understood to be commerce between a United States seller and foreign buyer in which the goods flow from the United States to a foreign country. . . . Because of the FTAIA, higher prices paid by foreign consumers are not covered by U.S. antitrust law unless there is a sufficiently significant and direct effect on the domestic market place." *Lavoho, LLC v. Apple Inc.*, 71 F. Supp. 3d 395, 398 (S.D.N.Y. 2014) (internal citation omitted).

injure the United States economy.") (internal quotation marks and citation omitted). Nett's allegations are insufficient to demonstrate that either exception to the FTAIA could apply to save its claim, which is entirely premised on foreign injury.[13] Further underscoring this insufficiency, Nett has not made any effort to allege that either exception to the FTAIA applies to its claim.

At best, the Complaint has alleged that the effects of the claimed global conspiracy on the United States market were, at most, a "but for" cause of Nett's foreign injury—a link in a chain— not the direct cause. Such a showing is insufficient to survive a motion to dismiss. *See, e.g.*, *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 786, 790 (N.D. Cal. 2007) (dismissing Sherman Act claims as to foreign injury where plaintiffs alleged that prices paid for rubber chemicals in global market were "inextricably linked" and correlated with domestic prices, and finding that such allegations constituted only "but for" cause, not the necessary direct proximate causation). The "domestic effects" exception to the FTAIA requires a showing that the domestic (U.S.) effect of the alleged antitrust conduct "gives rise to" the plaintiff's alleged foreign injury, namely that the domestic effects are a "proximate cause" of the foreign injury. *E.g.*, *In re Hydrogen Peroxide Antitrust Litig.*, 702 F. Supp. 2d 548, 552–53 (E.D. Pa. 2010) (holding that, for FTAIA domestic effects exception, plaintiffs must demonstrate by a preponderance of the

---

[13] The import exception to the FTAIA does not apply here. The Complaint presents only a single allegation regarding the importation of products into the United States, Compl. ¶ 46, and no allegation that Nett's purchases were of imported Ceramic Substrates. *E.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 09-1827 SI, C 09-5840 SI, 2010 WL 2610641, at *5 (N.D. Cal. June 28, 2010) ("The dispositive inquiry is whether the conduct of the defendants . . . involved import commerce."). Furthermore, the concept of import commerce is narrowly constructed. *See Carpet Group Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 71 (3d Cir. 2000) ("Admittedly, the FTAIA differentiates between conduct that 'involves' such [import trade or import commerce], and conduct that 'directly, substantially, and foreseeably' affects such commerce. To give the latter provision meaning, the former must be given a relatively strict construction."), *overruled on other grounds by Animal Sci. Prods, Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011).

evidence that domestic effects of the defendants' antitrust conduct give rise to their claim by showing that such domestic effects proximately caused their foreign injuries); *see also Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 857 (7th Cir. 2012) (holding that an effect on commerce is 'direct' if there is a reasonably proximate causal nexus; that is, if the effect is proximately caused by the alleged anticompetitive conduct).   The burden of presenting such allegations falls squarely on the plaintiff.  *E.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 960 (N.D. Cal. 2011) ("In order to establish that a domestic effect 'gives rise to' a Sherman Act claim, the complaint ***must*** allege facts sufficient to show that the domestic effects proximately caused the plaintiff's foreign injury.") (emphasis added) (citation omitted).

Nett's allegations fail to carry this burden.  As with the plaintiff in *In re DRAM Antitrust Litigation*, Nett has not sufficiently alleged that "the higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad."  546 F.3d 981, 988 (9th Cir. 2008); *see also F. Hoffman-LaRoche, Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (holding that under the FTAIA, the Sherman Act does not apply to a claim based on a foreign effect where "price-fixing conduct significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect").  Nett has not even specified the country from which it allegedly purchased Ceramic Substrates, nor provided any support or "factual enhancement" for its bald allegation that a "price floor" was set for "all" direct purchasers due to the Defendants' actions relating to global automotive OEM purchases made via an RFQ process.

In light of Nett's failure to show the necessary direct causal relationship (*i.e.,* proximate causation) between its alleged foreign injury and the domestic effects of the alleged conspiracy, the domestic-effects exception to the FTAIA cannot apply to Nett's claim.  *See Empagran II*, 417

F.3d at 1270–71 ("The statutory language—'gives rise to'—indicates a direct causal relationship, that is, proximate causation, and is not satisfied by the mere but-for 'nexus'[.]"); *see also In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 540 (8th Cir. 2007) (holding that domestic effects exception did not apply to antitrust claim involving foreign purchase where United States pricing was "merely one link in the causal chain" of a global price-fixing conspiracy, therefore establishing at most "but for" causation between the U.S. market and the foreign injury); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2010 WL 2610641, at *7 (dismissing foreign injury claims where plaintiff failed to allege facts showing how the plaintiff's foreign injuries were proximately caused by any domestic effects of the defendants' conduct).

Notably, the FTAIA has resulted in the dismissal of other antitrust claims where, as here, a foreign purchaser did not allege a purchase from the United States and did not present sufficient allegations that an exception to the FTAIA would apply.  *E.g.*, *Monosodium Glutamate*, 477 F.3d at 536–537 (affirming dismissal of foreign purchasers' suit on FTAIA grounds where plaintiffs did not assert that they purchased the product at issue in the United States market); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 600-01 (S.D.N.Y. 2015) (dismissing antitrust claims by foreign plaintiffs based, in part, on finding that domestic effects exception to FTAIA did not apply where foreign plaintiffs presented allegations of a global conspiracy that resulted in injuries to a number of global markets and also presented only conclusory allegations as to the link between their foreign injury and the domestic effects of the conspiracy).

Furthermore, Nett's ambiguous, vague allegations are insufficient to demonstrate the nation from which the proximate cause of its foreign injury emanates.  There is an ongoing direct purchaser antitrust case in the Canadian court system regarding the allegations of Canadian direct

purchasers (such as Nett) in relation to the alleged global OEM price-fixing conspiracy.[14]  There is thus a significant risk that, if Nett is indeed a proper Plaintiff in such an action, Nett may obtain a "double-dip" recovery on its injury by recovering in both U.S. and Canadian courts for its foreign purchases.  Given Nett's undisputed status as a non-U.S. company and the ambiguity created by Nett's sparse allegations regarding its purchases, comity requires that the Court dismiss Nett's claim to avoid any potential unreasonable interference with the sovereign authority of other nations.  *Cf. F. Hoffman-La Roche*, 542 U.S. at 164 (finding, in consideration of avoiding interference with the sovereign authority of other nations, that exception to FTAIA does not apply where price-fixing conduct impacts both U.S. and ex-U.S. customers but foreign effect is independent of domestic effect); *see also Monosodium Glutamate*, 477 F.3d at 538 (affirming dismissal of antitrust claim based on foreign purchases, in part, because of principles of prescriptive comity to avoid unreasonable interference with the ability of foreign nations to regulate their own commercial affairs).

## III.    PLAINTIFFS' CLAIMS ARE TIME-BARRED

This Court has previously considered, and denied, a timeliness challenge to claims by indirect purchasers based on Corning Incorporated's public disclosure.  *In re Ceramic Substrates*, Nos. 2:16-cv-3802, -3803, 2017 WL 7689654, at *2–7 (E.D. Mich. May 5, 2017) (Battani, J.). Defendants acknowledge and understand the Court's determinations with respect to the IPPs; however, we respectfully submit that the Direct Purchaser Plaintiffs here are differently situated in material ways—as more sophisticated parties who claim to be direct purchasers from Defendants—such that they were, or should have been, put on inquiry notice as of the date of the

_____

[14] *Sheridan Chevrolet Cadillac Ltd. & NGK Insulators, Ltd.*, Statement of Claim (Ceramic Substrates), No. cv-16-549735, Mar. 30, 2016 (Sup. Ct. Ontario).

public disclosure.  Here, Plaintiffs, as direct purchasers with notice of their claims, were required to file this action no later than March 30, 2016.  Instead, Plaintiffs waited to file until November 21, 2017, more than nineteen months too late.

### A.  Plaintiffs' Claims Are Time-Barred Based On The Last Alleged Date Of Conduct

"For statute of limitations purposes" in the Sixth Circuit, "the focus is on the timing of the ***causes*** of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (per curiam) (emphasis added).  Plaintiffs allege that Defendants were involved in distinct Ceramic Substrates conspiracies directed at different automotive OEMs, none of which are alleged to have persisted beyond July 2011 at the latest.[15]  Compl. ¶¶ 77-78.  Plaintiffs allege no facts to show that the alleged anticompetitive conduct continued beyond this date.[16]  A continuing violation requires that Plaintiffs plead "a new and independent act" —more than simply a reaffirmation of a previous injury—in order to restart the clock on the statute of limitations.  *See Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999).  The Sixth Circuit has been unequivocal that "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period," and has "repeatedly emphasized that profits, sales, and other benefits accrued as the result of an

---

[15] Plaintiffs claim that the Corning Defendants were involved in a purported conspiracy "until on or about July 2011," thus providing a specific time period in which Corning's alleged conduct terminated.  Compl. ¶¶ 77–78.  Plaintiffs allege that the NGK and Denso Defendants' anticompetitive conduct lasted "at least until February 2010."  Compl. ¶¶ 74, 82.

[16] Plaintiffs baselessly attempt to extend their alleged Class Period to May 16, 2016, the date of CIKK's plea agreement.  Compl. ¶¶ 4, 103.  But this is a conclusory allegation that contradicts the only specific overt acts alleged by Plaintiffs, which end much earlier in 2010 and 2011.  *See supra* note 15; Compl. ¶¶ 77–78.  This conclusory and contradictory pleading is insufficient to allege anticompetitive conduct into 2016.

initial wrongful act are not treated as 'independent acts,'" but rather as mere "ripples caused by the initial injury." *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014). Plaintiffs have presented no factual allegations to indicate that any independent overt act in furtherance of the alleged conspiracy occurred after July 2011. Thus, absent tolling of the statute of limitations, Plaintiffs' claims were barred as of July 2015 and must be dismissed.[17]

The speculative-damages exception to the antitrust statute of limitations is inapplicable here and does not alter the result that dismissal is required. This exception permits plaintiffs to maintain causes of action filed more than four years after the occurrence of the alleged anticompetitive conduct giving rise to the damages, when the damages claimed could not have been proven at the time of the conduct. *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 82 (6th Cir. 1981) (allowing "future damages which could not be proved within four years of the conduct from which they flowed"). This Court previously found it possible that indirect purchaser plaintiffs fell into the speculative damages exception because Plaintiffs alleged that Defendants' bids are generally made three years prior to the the start of vehicle production, and a particular model vehicle remained on sale for four to six years after production. *See Ceramic Substrates*, 2017 WL 7689654, at *3. IPPs alleged a time lapse of seven to nine years between Defendants' bid

---

[17] For similar reasons, Plaintiffs' request for injunctive relief should be denied. *See* Compl., Prayer for Relief, ¶ D. Plaintiffs fail to allege facts to warrant injunctive relief in this case, which would require that Plaintiffs "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Plaintiffs do not suggest, and certainly do not allege, that the purported conspiracy continues or is likely to recur.

submissions and their own purchases of allegedly affected vehicles, which they claimed triggered their damages and gave rise to their claims.  *Id.*

Here, Plaintiffs can make no such argument.  Unlike IPPs, Plaintiffs were not purchasers of fully manufactured vehicles that unbeknownst to them contained Ceramic Substrates manufactured by the Defendants, years after the events that gave rise to their claims.  No intervening steps necessarily delayed the onset of Plaintiffs' alleged damages such that the statute of limitations should be tolled.  Instead, Plaintiffs' alleged damages accrued and the statute of limitations began to run upon Defendants' last alleged overt anticompetitive act:  submission of a rigged bid prior to July 2011.  *See* Compl. ¶ 77.

**B.     There Is No Basis To Toll The Statute Of Limitations And, Even If There Were, Plaintiffs' Claims Lapsed By March 30, 2016**

Plaintiffs have not plausibly pled that Defendants engaged in any fraudulent concealment to obscure the alleged conspiracy, *see* Compl. ¶¶ 90–99, and, even if they had, any such tolling necessarily ceased as of March 30, 2012, when the first public disclosure occurred of the DOJ's Ceramic Substrates investigation, followed by wide media coverage.  Notwithstanding that these events put Plaintiffs on inquiry notice of the claims now pending against Defendants, Plaintiffs failed to conduct the requisite due diligence or file their Complaint within the four-year statutory period.

The statute of limitations may be tolled in certain limited circumstances, including where the facts of a potential claim have been hidden from the plaintiff by fraudulent concealment. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).  But even in these circumstances, the statute of limitations begins to run when "the fraud is or should have been discovered."  *Gaudin v. KDI Corp.*, 576 F.2d 708, 712 (6th Cir. 1978).  Moreover, a plaintiff alleging concealment must plead facts plausibly showing that it exercised reasonable diligence in

seeking to discover its claims.  *See Dayco*, 523 F.2d at 394; *Wire Harness*, 2015 WL 10376960, at *3; *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988).[18]

Plaintiffs must first plausibly allege that Defendants wrongfully concealed the purported conspiracy.  *See, e.g.*, *Carrier Corp.*, 673 F.3d at 447 (by affirmative acts); *Venture Glob. Eng'g, LLC v. Satyam Comp. Servs., Ltd.*, 730 F.3d 580, 587 (6th Cir. 2013) (by self-concealing fraud). Plaintiffs assert that Defendants concealed the alleged conspiracy such that Plaintiffs did not, and could not, "have learned or discovered, the existence of the conspiracy alleged . . . until September 3, 2015, the date when investigations into price fixing in the Ceramic Substrates industry by antitrust regulators first became public."  Compl. ¶¶ 91–92.  This allegation is demonstrably false in the context of the information in the public domain as of March 30, 2012, *see* RJN Exs. 6, 8–25, and thus should be rejected as implausible on its face.  Repeated and frequent voluntary, public disclosures are antithetical to any plan to "conceal."  *Cf. Farag v. Health Care Serv. Corp.*, No. 17 C 2547, 2017 WL 2868999, at *8 (N.D. Ill. July 5, 2017) (finding that "matters of public record . . . undercut the notion that there was any concealed or undetectable injury resulting from [defendant's] alleged wrongful" conduct).

Between March 2012 and March 2016, Corning Incorporated filed a total of twenty public reports, all of which publicly disclosed the existence and status of the DOJ's antitrust investigation into the Ceramic Substrates market.  RJN Exs. 6, 8–25 (Corning Incorporated's 10-K, ARS, 10-Q, and 8-K filings).  These public disclosures preclude these Plaintiffs from plausibly pleading

---

[18] To do so, Plaintiffs must plausibly allege "(1) [defendants'] wrongful concealment of their actions; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Hamilton Cty. Bd. of Comm'rs v. NFL*, 491 F.3d 310, 315 (6th Cir. 2007).  Moreover, the Sixth Circuit requires that these elements be pled with specificity under Federal Rule of Civil Procedure 9(b).  *See Dayco*, 523 F.2d at 394 (applying Fed. R. Civ. P. 9(b)).

wrongful concealment after March 30, 2012. *See TFT-LCD*, 2012 WL 273761, at *3 ("[W]hen the conspiracy became publicly known . . . , any wrongful conduct on the part of the defendants stopped having its effect, removing the basis for plaintiff's tolling.").

Nor can Plaintiffs adequately plead due diligence, as knowledge of a claim may be imputed to a plaintiff where public facts and circumstances are sufficient to place a plaintiff on inquiry notice of his claim. *Carrier Corp.*, 673 F.3d at 448–49. Assuming, in the alternative to the arguments above, that Plaintiffs operate in the same market as the alleged conspiracy, the public disclosures of the DOJ's Ceramic Substrates investigation and the widely publicized reporting on those disclosures constitute inquiry notice to Plaintiffs with respect to any claim based on the alleged conspiracy targeting automotive purchasers.[19] Indeed, any minimally diligent direct purchaser plaintiff would have discovered the March 2012 8-K filing, as SEC filings are sufficient to "inform Plaintiffs of the nature of their claims." *See In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 744-45 (D.N.J. 2016). This is particularly so where, as here, Plaintiffs allege that they purchase *directly* from Defendants. *See, e.g.*, Compl. ¶¶ 19-20. Unlike indirect purchasers, who are separated from automotive parts suppliers by one or more levels of the supply chain, direct purchasers transact directly with Defendants and would thus have cause to follow widely publicized reports revealing the existence of a government

---

[19] *See Wire Harness*, 2015 WL 10376960, at *4–5. In *Wire Harness*, the Court found that publicity sufficient to put potential plaintiffs on notice of antitrust claims in the automotive passenger vehicle market was not sufficient to constitute notice of similar claims in the separate market for trucks and equipment where there were no "widely publicized earlier investigations of exactly the same antitrust violations." *Id. at *5*. The logic of that decision creates a fatal catch-22 for Plaintiffs. To avoid dismissal for lack of standing, Plaintiffs must show that they operate in the same automotive market as the alleged conspiracy. But if Plaintiffs establish standing by showing that they operate in the same market as the automotive OEMs, their claims are time-barred based upon the widely publicized disclosures about the DOJ's investigation into the market for Ceramic Substrates.

investigation of the alleged conspiracy.  Considering that the grand jury investigation was publicly disclosed, reported on by industry-specific publications *and* mainstream media, and the disclosure was updated at least four times a year for four years, it is simply not plausible that alleged direct purchasers from Defendants in the Ceramic Substrates market could have remained completely unaware of this significant development without being grossly deficient in their diligence.[20]

On this record, Plaintiffs' failure to allege any facts concerning their diligence is fatal to their fraudulent concealment arguments against Defendants.  "[T]hose plaintiffs who delay unreasonably in investigating circumstances that should put them on notice will be foreclosed from filing, once the statute has run[.]"  *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982).  This situation is the exact opposite of the one this Court considered in a different *Wire Harness* opinion, in which it permitted a potentially time-barred claim to go forward based on fraudulent concealment allegations because there was no public disclosure to put the plaintiffs on inquiry notice.  *See Wire Harness*, 2013 WL 2456584, at *13.  In contrast, a wealth of public information existed here sufficient to put Plaintiffs, as alleged direct purchasers of Ceramic Substrates, on inquiry notice well in advance of September 2015.  Moreover, the fundamental policies underlying limitations periods compel dismissal:  the conduct giving rise to the Complaint is alleged to have commenced nearly twenty years ago and concluded seven years ago.  Litigation of such allegations would force all parties, and the judicial system itself, to deal with the deterioration of evidence and

---

[20]   This is especially so where, as here, Plaintiffs allege that Defendants together account for approximately 90% of the Ceramic Substrates market.  Compl. ¶ 52.  The disclosure of an investigation into potential anticompetitive conduct by one of these Defendants would lead a reasonable observer holding this belief, particularly a purported customer of the three, to inquire as to whether the other major vendors in the market were involved.  Moreover, only a few weeks prior to its initial disclosure, Corning Incorporated had publicly identified NGK and DENSO as its "principal" competitors in the market for "automotive ceramic substrate products."  *See* RJN Ex. 7 at 5.

faded recollections.  This burden is prohibited by the statute of limitations:  "Stale conflicts should be allowed to rest undisturbed after the passage of time has made their origins obscure and the evidence uncertain."  *Pinney Dock*, 838 F.2d at 1467 (quoting *Upjohn Co.* 676 F. 2d at 1128 (6th Cir. 1982)).  The claims of these alleged direct purchasers should thus be eliminated by dismissal, with prejudice, of Plaintiffs' time-barred Complaint.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that the Court dismiss Plaintiffs' Complaint in its entirety and with prejudice as there is no means for Plaintiffs to amend and cure their defects of lack of standing, noncompliance with the FTAIA, and expiration of the limitations period.

Dated: July 6, 2018                                  Respectfully submitted,

WINSTON & STRAWN LLP

By: */s/ Jeffrey L. Kessler*
     Jeffrey L. Kessler
     Jeffrey J. Amato
     Angela A. Smedley
     WINSTON & STRAWN LLP
     200 Park Avenue
     New York, NY 10166
     Telephone: (212) 294-6700
     Facsimile: (212) 294-4700
     jkessler@winston.com
     jamato@winston.com
     asmedley@winston.com

     Tiffany R. Rohrbaugh
     SKADDEN, ARPS, SLATE, MEAGHER &
     FLOM LLP
     1440 New York Avenue, NW
     Washington, DC 20005
     Telephone: (202) 371-7000
     Facsimile: (202) 661-9139
     tiffany.rider@skadden.com

*Counsel for Corning Incorporated and*
*Corning International Kabushiki Kaisha*

MCDERMOTT WILL & EMERY, LLP
Stefan M. Meisner (DC Bar No. 467886)
Daniel G. Powers (DC Bar No. 997749)
Emre N. Ilter (DC Bar No. 984479)
Lisa A. Peterson (DC Bar No. 1020986)
500 North Capitol Street, N.W.
Washington, DC  20001
(202) 756-8000
smeisner@mwe.com
dgpowers@mwe.com
eilter@mwe.com
lpeterson@mwe.com

O'REILLY RANCILIO, P.C.
James C. Thomas (P23801)
Local Counsel to Defendant,
NGK Insulators, Ltd.
12900 Hall Road, Suite 350
Sterling Heights, MI 48313
586-726-1000
jthomas@orlaw.com

*Attorneys for NGK Insulators, Ltd.*
*and NGK Automotive Ceramics USA, Inc.*

*/s/ Steven F. Cherry*
Steven F. Cherry
David P. Donovan
Seth Bastianelli
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
steven.cherry@wilmerhale.com
david.donovan@wilmerhale.com
seth.bastianelli@wilmerhale.com

*Attorneys for Defendants DENSO Corporation*
*and DENSO International America, Inc.*

Steven M. Zarowny (P33362)
General Counsel

DENSO International America, Inc.
24777 Denso Drive
Southfield, MI 48033
Tel.: (248) 372-8252
Fax: (248) 213-2551
steve_zarowny@denso-diam.com

*Attorney for Defendant DENSO International America, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will send notification of such filing to each attorney of record herein by electronic means.

Dated:  July 6, 2018.                          */s/ Jeffrey L. Kessler*
                                               Jeffrey L. Kessler
                                               WINSTON & STRAWN LLP
                                               200 Park Avenue
                                               New York, NY 10166
                                               Telephone: (212) 294-6700
                                               Facsimile: (212) 294-4700
                                               jkessler@winston.com